868 So.2d 1128 (2001)
Calvin STALLWORTH
v.
STATE.
CR-98-0366.
Court of Criminal Appeals of Alabama.
September 28, 2001.
Opinion on Return to Remand March 1, 2002.
Opinion on Return to Second Remand January 31, 2003.
Rehearing Denied March 7, 2003.
*1136 Cathleen I. Price and Bryan A. Stevenson, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen.; and James R. Houts, Jeremy W. Armstrong, and Henry M. Johnson, asst. attys. gen., for appellee.
WISE, Judge.[1]
The appellant, Calvin Stallworth, was indicted for two counts of capital murder for murdering Nancy Dukes and Linda Morton during the course of a robbery. Both Dukes and Morton were employees of convenience stores off Highway 59 in Foley. The two counts were consolidated for trial and Stallworth was convicted of both counts as charged in the indictments. The jury, by a vote of 10 to 2, recommended that Stallworth be sentenced to death in each case. The trial court accepted the jury's recommendation and sentenced Stallworth to death by electrocution for both convictions of capital murder.
The State's evidence tended to show the following: On December 4, 1997, John Gregory entered the Dukes Parkway Shell gasoline service station in Foley and discovered Nancy Dukes behind the counter on her knees with her arms and face in a chair. She had been stabbed numerous times, but she was still breathing. Gregory called for help, but Dukes died before the paramedics arrived. The coroner testified that Dukes had been stabbed approximately 40 times and that she died as a result of those injuries. There was testimony that between $400 and $600 was missing from the cash register.
On December 14, 1997, Van Gardener discovered Linda Morton's body lying face down on the floor behind the counter at the Diamond Gas Station and Convenience Store in Foley. The coroner testified that Morton had been stabbed six times and that she died as a result of those injuries. An audit of the cash register revealed that it was $934.00 short.
While investigating Morton's murder, police used a bloodhound at the Diamond store. The bloodhound went to a trail behind the store that went through a small wooded area and led to the Aaronville community. On the trail police discovered a broken VCR, identified as the VCR from the Diamond store, and a bag of receipts that contained checks and credit card receipts. An eyewitness, Olivia Woodyard, testified that around the time of Morton's murder she saw Stallworth leaving the trail behind the Diamond store. Woodyard testified that Stallworth was acting strangely and was nervous. She also testified that Stallworth had told her a few days before the robbery/murder that he was under a lot of stress because Christmas was near and he had no job. Another *1137 eyewitness testified that he saw a male wearing a dark, hooded jacket run from the Diamond store around the time of Morton's murder.
Numerous witnesses testified that Stallworth was spending a lot of money between December 4 and December 16, although he was not employed. Christina Lorraine Waters, a former employee of Riviera Utilities, testified that on December 4, 1997, just hours after Dukes was robbed and killed, Stallworth paid a delinquent electric power bill for his fiancée in the amount of $167.12. (Stallworth's fiancée, Deborah Pickens,[2] told him that the electric power had been cut off on the morning of December 4.) Waters also testified that when she was taking Stallworth's payment another employee was on the telephone and you could overhear her talking about Nancy Dukes's murder. Waters said that when Stallworth heard the statement about Dukes's murder he reacted by saying "Oh, man" and hanging his head. (R. 268.) Glenn Manning, the owner of Manning Jewelry in Foley, testified that on December 4, 1997, Stallworth paid him $100 for jewelry repairs that he had completed. Stallworth was also reported to have made several cash purchases at a Wal-Mart discount store.
On December 16, 1997, the investigation focused on Stallworth, and police discovered that Stallworth was wanted for a probation violation.[3] Police picked Stallworth up for the probation violation, questioned him about the two murders, and obtained a search warrant to search his fiancée's home, where he was living. Police seized a hooded jacket that had blood on the inside of one of the sleeves. DNA testing revealed that the blood on the jacket matched Dukes's DNA. The search of Stallworth's fiancée's house also revealed a serrated kitchen knife under the mattress. Experts testified that the knife was the same type of knife used to kill both Dukes and Morton.
Stallworth gave several statements to policeeach of which varied in some detail. Stallworth admitted that he was at the scene of both robbery/murders, but he denied killing either Dukes or Morton. Stallworth also admitted that he had removed the VCR from the Diamond store because, he said, he knew the videotape would show him in the store. Stallworth said that he took the VCR to a trail behind the Diamond store and he used a hammer to open it and destroy the tape. Stallworth also told police that he found a bag of money on the trail and that he took the money and left.
Stallworth testified in his own defense at trial. He said that he had not been at either scene and that his statements to police were coerced. He said that he had an alibi for the time of both murders. (Defense witnesses also testified that he had an alibi.) Stallworth also testified that he paid his bills in December 1997 with his "cousin's help, shooting dice, and selling a little marijuana." (R. 3950.) He said that police coerced him to confess that he had been present at the Dukes station and the Diamond store after police threatened his daughter, his wife, his mother, and his brother. He further testified that Woodyard lied about seeing him near the Morton murder scene because, he said, he "wouldn't give her no drugs, no free drugs." (R. 3989.) He also said that *1138 somebody in the police department planted Dukes's blood on his jacket. (R. 4006.)
Stallworth offered his own version of every item of evidence in the State's possession. However, the jury chose to believe the State's version of the events and found Stallworth guilty of both counts of robbery/murder. After a sentencing hearing the jury voted 10 to 2 to sentence Stallworth to death on each conviction. The trial court held a separate sentencing hearing and then sentenced Stallworth to death by electrocution for each count of capital murder. Stallworth appealed.

Standard of Review
Stallworth has been sentenced to death by electrocution. As with any other case in which the sentence of death has been imposed, this Court must review the record for any plain error. Rule 45A, Ala. R.App.P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have stated the following concerning the plain-error standard of review:
"`The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998); cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).'"
Johnson v. State, 820 So.2d 842, 850 (Ala. Crim.App.2000), aff'd, 820 So.2d 883 (Ala. 2001), quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999). "We have repeatedly recognized that the plain-error rule is to be used sparingly and only in those cases where a miscarriage of justice would result." Johnson, 820 So.2d at 850.

Guilt-Phase Issues

I.
Stallworth argues that the trial court erred in not granting his motion to have the grand jury testimony transcribed. Specifically, he argues that the failure to provide him with the transcript of the witnesses' testimony before the grand jury deprived him of the opportunity to attack the witnesses' credibility at trial and reduced the reliability of his trial. He asserts that he is "entitled to a new trial after properly transcribed grand jury proceedings." (Stallworth's brief, p. 98.)
This Court stated in Steward v. State, 55 Ala.App. 238, 314 So.2d 313 (Ala.Crim. App.), cert. denied, 294 Ala. 201, 314 So.2d 317 (Ala.1975):
"There is no law requiring the recording of testimony before a grand jury in Alabama. The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret. This matter is thoroughly elucidated *1139 in the recent case of State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779, in an opinion by Presiding Judge Cates of this court."
As we more recently stated in Hardy v. State, 804 So.2d 247, 287 (Ala.Crim.App. 1999), aff'd, 804 So.2d 298 (Ala.2000):
"In Alabama there is no statute requiring that testimony before a grand jury be recorded. `A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779. There is no such statute in this state.' Sommerville v. State, 361 So.2d 386, 388 (Ala.Cr. App.), cert. denied, 361 So.2d 389 (Ala. 1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit."
There was no error in failing to order that the grand jury testimony be transcribed when the testimony had not been recorded.
Moreover, in Alabama, before grand jury testimony may be disclosed to an accused, the accused must show that he has "a particularized need" for the testimony. If this need is shown, then the trial court must weigh the need against the time-honored tradition of guarding the secrecy of the grand jury proceedings. As we stated Mitchell v. State, 706 So.2d 787, 806-07 (Ala.Crim.App.1997):
"`While it is true that broader discovery is to be allowed in cases involving capital murder because of the possible imposition of the death penalty, Ex parte Monk, 557 So.2d 832, 836-37 (Ala.1989), a defendant must make a preliminary showing of particularized need before a court can balance this need against the policy favoring grand jury secrecy.' Arthur v. State, [711] So.2d [1031] at [1078] [(Ala.Crim.App.1996)]. Mitchell did not make a preliminary showing of particularized need for the grand jury information. The trial court correctly denied the motion.
"Additionally, Mitchell contends that the grand jury material was needed to challenge the propriety of the proceedings. We agree with the State's argument that the propriety of the proceedings cannot be determined from the testimony of the witnesses and that Mitchell has not alleged with any specificity what improprieties the grand jury committed. We also agree with the State that the appellant's cited authority, Butterworth v. Smith, 494 U.S. 624, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990), does not support his argument on this issue. Butterworth stands for the proposition that a grand jury witness is not forever prohibited from disclosing his or her own grand jury testimony after the term of the grand jury has ended. Butterworth v. Smith, 494 U.S. 624, 626, 110 S.Ct. 1376, 1378, 108 L.Ed.2d 572. Butterworth is distinguishable from the present case, where the defense seeks the testimony of all grand jury witnesses on what appears to be a fishing expedition. Mitchell failed to persuade this court that grand jury material was needed to challenge the propriety of the proceedings. The trial court correctly denied the motion."
(Emphasis added.)
Stallworth made no showing that he had a particularized need for the grand jury testimony. It appears that Stallworth was *1140 merely on a fishing expedition. There was no error here.

II.
Stallworth argues that the trial court erred in denying his motion asking Judge James H. Reid to recuse himself from presiding over the case. Stallworth argues in brief, "The basis for this was because in the months between Mr. Stallworth's arrest and the start of his trial, the judge and his court reporter attended a meeting of the Alabama Rotary Club at which the Foley Chief of Police James Miller was the guest speaker. During his speech, Chief Miller spoke about the facts of the case against Mr. Stallworth, including the facts of his statements." (Stallworth's brief, p. 67.) This meeting occurred the year before the case was tried.
The record reflects that a pretrial hearing was held on this issue. The defense called Mary Murchison, a Baldwin County attorney, who had attended the Rotary Club meeting. She testified that Chief Miller spoke to a group of 40 to 60 people and he mentioned Stallworth and made sarcastic comments about him. Murchison also testified that Judge Reid did not respond to any of the remarks. The following then transpired:
"[Prosecutor]: Yes. Yesterday, when Mrs. Murchison testified, she said Your Honor did not speak at the luncheon, made no comments at all.
"In fact, she said she heard no comments made to the Court by any person present.
"In fact, she said she didn't even realize that the judge was present at the meeting.
"I mean, that's how low key his attendance was at the meeting. And he was just an attendee at the Rotary luncheon, and made no statements whatsoever about the case, as far as we know, to anybody.
"There's no evidence of any improper conduct by the Court.
"And also, in her testimony, the witness stated that what she learned from the case was more from reading the newspaper than attending the meeting.
"There were comments made, but not anything that would have affected this Court.
"....
"[Defense counsel]: Our only response is, we never alleged that you got up and spoke at the meeting. And the notion of improper conduct, as this court is aware, is not the test.
"It's the appearance of impropriety. It's not the appearance of impropriety to us lawyers, that know that you are [not] the judge of the facts, and the jury is the judge of the facts, it's the appearance of impropriety when the Joe Schmo on the street knows that this judge was at a Rotary Club meeting where the Foley police chief talked about Calvin Stallworth, and what he said about the case.
"Now, it's not to the lawyers in the case; it's to the average person. And that is to who it appears improper.
"The Court: All right. I deny the motion to recuse."
(R. 83-85.)
"All judges are presumed to be impartial and unbiased." Woodall v. State, 730 So.2d 627 (Ala.Crim.App.1997), aff'd in relevant part, 730 So.2d 652 (Ala.1998). The burden in on the party making a motion to recuse to establish that the trial judge is biased or prejudiced against the defendant. Canon 3.C.(1), Canons of Judicial Ethics, states, "A judge should disqualify himself in a proceeding in which his disqualification is required by law or his *1141 impartiality might reasonably be questioned." Stallworth argues that Judge Reid's impartiality might reasonably be questioned because of his inadvertent exposure to the remarks made about Stallworth. We do not agree.
As the Alabama Supreme Court has stated:
"The standard for recusal is an objective one: whether a reasonable person knowing everything that the judge knows would have a `reasonable basis for questioning the judge's impartiality.' [Ex parte] Cotton, 638 So.2d [870] at 872 [(Ala.1994) ]. The focus of our inquiry, therefore, is not whether a particular judge is or is not biased toward the petitioner; the focus is instead on whether a reasonable person would perceive potential bias or a lack of impartiality on the part of the judge in question. In In re Sheffield, 465 So.2d 350, 357 (Ala.1984), this Court wrote:
"`The reasonable person/appearance of impropriety test, as now articulated in Canon 3(C)(1), in the words of the Supreme Court of the United States may "sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). As stated in Canon 1 of the Code of Judicial Ethics, "An independent and honorable judiciary is indispensable to justice in our society," and this requires avoiding all appearance of impropriety, even to the point of resolving all reasonable doubt in favor of recusal.'"

Ex parte Bryant, 682 So.2d 39, 41 (Ala. 1996) (some emphasis original; some emphasis added in Bryant).
In In re Raines, 294 Ala. 360, 366, 317 So.2d 559 (1975), the Court stated that any "pretrial involvement or knowledge on the part of a trial judge does not necessarily create an unconstitutional risk [of] bias." We refuse to hold that a judge is required to recuse himself or herself when the judge has inadvertently been exposed to remarks about a case. It is another matter, however, if the judge chooses to respond to remarks he or she has overheard about a case. There is no contention, indeed the testimony established otherwise, that Judge Reid made any remarks concerning Chief Miller's comments about Stallworth. Stallworth has failed to present any evidence that would require Judge Reid to disqualify himself from the case or that would cast doubt on Judge Reid's impartiality. "We ... note that appellant has pointed to no occurrence during the trial, and we can find none, in which the judge acted in any way other than entirely impartially." Lewis v. State, 535 So.2d 228, 233 (Ala.Crim.App.1988). Judge Reid did not err in denying Stallworth's motion to recuse.

III.
Stallworth argues that the trial court erred in denying his motion for a change of venue because, he alleges, the publicity in the case resulted in his being unable to have a fair trial in Baldwin County.
The record reflects that Stallworth introduced numerous newspaper articles concerning the murders. It was uncontested that a great deal of publicity surrounded the two cases. Stallworth argued at trial and on appeal that the community was so saturated with pretrial publicity that he was unable to obtain a fair trial in Baldwin County.
The standard we use when evaluating whether a trial court has erred in denying a motion for a change of venue was addressed by the Alabama Supreme *1142 Court in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). The Court stated:
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)."
"`The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.' Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App.1992)." Wilson v. State, 777 So.2d 856, 924 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001). Moreover, we must consider the length of time between the alleged pretrial publicity and the trial. Wilson. "When requesting a change of venue, `the burden of proof is on the defendant to "show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.'" Jackson v. State, 791 So.2d 979, 995 (Ala.Crim.App.2000), cert. denied, 791 So.2d 1043 (Ala.2000), quoting Hardy v. State, 804 So.2d 247, 293 (Ala.Crim.App. 1999). Whether to grant a motion for a change of venue is addressed to the sound discretion of the trial court. Acklin v. State, 790 So.2d 975 (Ala.Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.2001), cert. denied, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001). The trial court is in a better position than is an appellate court to rule on such a motion. The trial court was present in the community at the time of the alleged pretrial publicity and knows the specifics of the history of the case in the community. We will not reverse a trial court's ruling on a motion for a change of venue unless a clear abuse of discretion is shown. Acklin.

Here, the record contains numerous articles about the two robbery/murders. However, most of the articles are *1143 factual accounts of the circumstances surrounding each case and the investigation of each case. No evidence indicated that the community was saturated with prejudicial pretrial publicity about the two cases. The fact that the community was not so saturated is shown by the voir dire examination. During voir dire the trial court asked the prospective jurors if they had any knowledge about the case. (R. 1182.) Eight jurors indicated that they had heard about the case from radio, newspaper, or television reports. Each of these jurors was taken to the bench and questioned about his or her knowledge of the case. Two jurors indicated that they could not render a fair and impartial verdict. These jurors were excused for cause. The other six jurors who had heard about the case indicated that they could be fair and impartial. A number of them indicated that the publicity about the case had been so long ago that they did not remember any pertinent facts about the case. (R. 1182-1222.) The voir dire supports the trial court's denial of the motion for a change of venue. There is absolutely no evidence that the trial court abused its discretion in denying this motion.

IV.
Stallworth argues that the trial court erred in granting the State's motion to consolidate the two capital-murder charges against him. The record reflects that Stallworth was indicted in January 1998 by two different indictments for two murders. The State moved that the cases be consolidated. Stallworth objected. The trial court held a hearing on the issue, heard oral argument from both sides, and granted the State's motion to consolidate. (R. 786-802.)
The first indictment charged the following:
"The Grand Jury of said County charge that before finding this indictment on to-wit: Calvin Stallworth, whose name is otherwise unknown to the Grand Jury other than as stated, did, with the intent to cause the death of another person, cause the death of Linda Morton, by stabbing and/or cutting her with a knife or other sharp instrument, or did cause Linda Morton's death in a manner otherwise unknown to the grand jury during a robbery in the first degree or an attempt thereof in violation of § 13A-5-40(2) of the Code of Alabama, against the peace and dignity of the State of Alabama."
(C.R. 14.)
The second indictment charged the following:
"The Grand Jury of said County charge that before finding this indictment on to-wit: Calvin Stallworth whose name is otherwise unknown to the Grand Jury other than as stated, did, with the intent to cause the death of another person, cause the death of Nancy Dukes, by stabbing and/or cutting her with a knife or other sharp instrument, or did cause Nancy Dukes' death in a manner otherwise unknown to the grand jury during a robbery in the first degree or an attempt thereof in violation of § 13A-5-40(2) of the Code of Alabama, against the peace and dignity of the State of Alabama."
(C.R. 505.)
Rule 13.3(a), Ala.R.Crim.P., states:
"Two or more offenses may be joined in an indictment, information, or complaint, if they:
"(1) Are of the same or similar character; or

*1144 "(2) Are based on the same conduct or are otherwise connected in their commission; or
"(3) Are alleged to have been part of a common scheme or plan."
This Rule does not exclude a trial court from consolidating capital-murder charges. In fact, we have specifically held that capital-murder charges are subject to joinder or consolidation as provided in Rule 13.3(a). See George v. State, 717 So.2d 827 (Ala.Crim.App.), rev'd on other grounds, 717 So.2d 844 (Ala.1996), on remand, 717 So.2d 849 (Ala.Crim.App.1997); Williams v. State, 710 So.2d 1276 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). See also Ex parte Hinton, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
In George v. State, we stated:
"Consolidation of similar offenses is specifically provided for in Rule 13.3(c), Ala.R.Crim.P. This rule states:
"`If offenses or defendants are charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together or that the defendants be joined for the purposes of trial if the offenses or the defendants, as the case may be, could have been joined in a single indictment, information, or complaint. Proceedings thereafter shall be the same as if the prosecution initially were under a single indictment, information, or complaint. However, the court shall not order that the offenses or the defendants, as the case may be, be tried together without first providing the defendant or defendants and the prosecutor an opportunity to be heard.'
"This rule does not exclude the consolidation of a capital offense and another offense.
"In Ex parte Hinton, 548 So.2d 562 (Ala), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), the Alabama Supreme Court first addressed the issue of the consolidation of two capital cases against one defendant. The Court in Hinton stated:
"`No capital cases have ever before been consolidated for trial in Alabama, and while Rule [13.3], A.R.Crim.P., provides for consolidation of similar offenses, Hinton argues that the consolidation of these two capital cases created such prejudice as to deny him a fair trial. Although different procedures apply in capital cases, we are not convinced that the defendant has shown prejudicial error sufficient to require reversal. Of course, if a defendant can demonstrate actual and compelling prejudice that outweighs the benefits of judicial economy resulting from joinder, the refusal to sever the cases constitutes reversible error. United States v. Payne, 750 F.2d 844, 859 (11th Cir.1985).'
"548 So.2d at 565 (emphasis in original).
"Thus, the question is whether the appellant can demonstrate `actual and compelling' prejudice. None was shown here. The appellant was tried for two counts of capital murder and for one count of attempted murder. The charges arose from one course of conduct. There is no indication that the jury could not separate the evidence relating to each crime. The trial court did not err in consolidating the offenses for trial."
717 So.2d at 832.
Stallworth cites Graves v. State, 632 So.2d 30 (Ala.Crim.App.1993), aff'd in part, *1145 rev'd in part, 632 So.2d 33 (Ala.1993), and Jenkins v. State, 472 So.2d 1128 (Ala.Crim. App.1985), as examples of cases in which this Court reversed a trial court's ruling on a motion to consolidate offenses. Each of those cases is distinguishable from the present case. In Graves, a charge of murder and a charge of possession of a pistol after having been convicted of a crime of violence were consolidated for trial. In order to prove the pistol-possession charge, the State had to introduce evidence of a prior conviction for a crime of violence. The State introduced a prior conviction of manslaughter. This Court reversed the murder conviction, holding that the introduction of the manslaughter conviction, which was not admissible in the trial on the murder charge, irrevocably prejudiced him in the eyes of the jury.[4] That is not the situation here.
Also, this Court in Williams stated the following concerning Jenkins v. State:
"The appellant inappropriately relies on Jenkins v. State, 472 So.2d 1128 (Ala. Cr.App.), cert. denied, 472 So.2d 1128 (Ala.1985). In that case, the consolidation of the charges of second-degree rape and indecent exposure with a charge of first-degree rape was held to be improper because `none of the evidence in one case overlapped with that in another case.' In this case, evidence in the two capital cases and the two attempted murder cases overlapped, and the offenses were of the same or similar character, were connected in their commission, and were part of a common scheme or plan. See Knotts v. State, 686 So.2d 431, 482 (Ala.Cr.App.1995).
"The appellant has failed to demonstrate the `actual and compelling' prejudice necessary to outweigh the benefits of judicial economy resulting from consolidation. See Ex parte Hinton, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989)."
710 So.2d at 1321.
The trial court did not err in consolidating the two capital indictments. Both crimes were similar: they were committed in the same city, on the same highwayHighway 59three miles from each other; both were committed at convenience stores; both involved stabbings of female clerks who were in the stores alone; and both were committed using a similar type of murder weapona serrated kitchen knife. The evidence in each of the capital cases was straightforward. Nothing in the record suggests that the jurors were unable to separate the evidence relating to each case. Also, a substantial amount of the evidencee.g., evidence that dealt with Stallworth's arrest, the search of his home, and his statements to policewas relevant in both cases. Based on the record in this case, we do not believe that the trial court erred in granting the State's motion to consolidate. Stallworth has completely failed to show "actual and compelling prejudice" from the joinder of the capital-murder charges.
As a separate issue, Stallworth argues that the trial court erred in allowing evidence of one of the robbery/murders to be introduced because it unduly prejudiced him. We are puzzled as to why Stallworth makes this argument, because the two capital-murder charges were consolidated for trial; therefore, evidence of both offenses was properly admitted at trial. There is absolutely no merit to this contention because the charges were properly consolidated pursuant to Rule 13.3, Ala.R.Crim.P. See Knotts v. State, 686 So.2d 431 (Ala. Crim.App.1995).

*1146 V.
Stallworth argues that the trial court erred in allowing two police officers, Captain Jimmy Flanagan and Officer Huey Mack, Jr., officers who investigated each case and who would be called as witnesses, to remain in the courtroom during the testimony of other witnesses.
Rule 615, Ala.R.Evid., and Rule 9.3(a), Ala.R.Crim.P., govern the exclusion of witnesses. Rule 615, Ala.R.Evid., states, in part:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim's guardian, or the victim's family."
We addressed this issue in Living v. State, 796 So.2d 1121, 1142-43 (Ala.Crim. App.2000), cert. denied, 796 So.2d 1121 (Ala.2001). In Living we stated:
"`Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief or similarly situated person who will later testify to remain in the courtroom during trial.' Carroll v. State, 599 So.2d 1253, 1261 (Ala.Crim.App.1992). In Stewart v. State, 601 So.2d 491 (Ala.Crim.App. 1992), this Court addressed an issue very similar to the one in the instant case. In Stewart, a police investigator was excepted from the rule requiring exclusion of all witnesses from the courtroom and was allowed to sit at the prosecution's table.
"In addition to being allowed to sit at the prosecutor's table, the police investigator in Stewart was allowed to testify from the prosecutor's table. Id. at 501. This Court held in Stewart that the appellant was not prejudiced by allowing the investigator to testify from the prosecutor's table and noted that `the jury knows that police officers investigate cases and assist the prosecution.' Id.

"Because the testimony of officers from the prosecutor's table does not prejudice a defendant, clearly an officer's mere presence at the table cannot be deemed so prejudicial as to constitute reversible error."
The trial court did not abuse its discretion in allowing the two law enforcement officers to remain in the courtroom during the testimony of other witnesses.

VI.
Stallworth argues that the trial court erred in not allowing individual voir dire of the prospective jurors. Here, the trial court allowed individual voir dire of jurors who answered certain questions in a particular manner.
As we stated in Ferguson v. State, 814 So.2d 925, 937-38 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001):
"`"In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court." Coral v. State, 628 So.2d 954, 968 (Ala.Cr.App.1992). "The fact that the appellant's case involved capital murder is not alone reason to require *1147 individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion." Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).'"
Quoting Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). We have examined the voir dire. There is no evidence that Stallworth was denied an extensive and thorough voir dire. Some of the voir dire was conducted individually. The trial court did not abuse its discretion in denying Stallworth's motion for individual voir dire of the prospective jurors.

VII.
Stallworth argues that the trial court impermissibly restricted his voir dire concerning possible racial bias. The record reflects that before trial, defense counsel filed a motion requesting that he be allowed to extensively question the veniremembers concerning possible racial bias. The trial court granted this motion. (R. 338.) During voir dire the following occurred:
"[Defense counsel]: I apologize, I'm going to make racial comments here, and I understand there's people of different races on all of the panels. I have to do this because I represent Mr. Stallworth, and I am concerned that he gets a fair trial.
"Some of you may feel like you don't want to answer the question in front of the rest of the panel. And if that's true, you can come up and talk in front of the judge.
"Is there anybody here that's afraid of black people?
"Is there anybody here who has ever made a comment about a black person negatively?
"[District attorney]: Objection to that, Judge.
"The Court: Come up to the bench, please.
"(Whereupon, the following Bench conference was had:)
"The Court: State your objection.
"[District attorney]: I think it's asking the question of the jury that's an improper question. If you want to have a battle concerning whether or not blacks have ever said anything ugly about whites, we're going to turn that into a racial circus. That's what this is headed for.
"And I think being in fear of blacks, I didn't object, I think that's fair. But anything that anybody ever said about a black person is turning this case into a racial circus. And it's improper.
"[Defense counsel]: The defense filed a motion to this a month ago, asking for extensive voir dire on racial prejudice, and the Court granted it.
"[District attorney]: But whether or not they ever said any comment negative about a black person is far beyond that. I think if they want to talk about whether or not they are a member of an organization that's prejudicial, or if they hold prejudices which prevent them from rendering a fair trial, that's perfectly legitimate. I'm not trying to cut off that type of questioning.
"But if you ask them if they ever said anything negative about anybody, they couldn't answer that about their dog, their wife, or the good Lord.
"The Court: I sustain the objection.
"....

*1148 "The Court: Well, I want counsel to understand that I am not prohibiting counsel from asking questions about whether people would be prejudiced against people of a minority group. And you can inquire into that area extensively. However, [the] specific question that you asked, though, going back to a person's childhood, if they ever have made a statement derogatory, I don't remember exactly the question about it, but a person of another race, this Court feels that would be inappropriate.
"[Defense counsel]: All right. I won't ask that question."
(R. 1378-96) (emphasis added).
Stallworth was allowed to question the jurors extensively about possible racial bias. However, the trial court would not allow Stallworth to ask a specific question about whether any of the prospective jurors had ever made a negative comment about blacks.
"`In selecting a jury for a particular case, "the nature, variety, and extent of the questions that should be asked prospective jurors" must be left largely within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975); Witherspoon v. State, 356 So.2d 743 (Ala.Crim.App.1978); Ervin v. State, 399 So.2d 894 (Ala.Crim. App.), cert. denied, 399 So.2d 899 (Ala. 1981).'"
Hall v. State, 820 So.2d 113, 124 (Ala.Crim. App.1999), aff'd, 820 So.2d 152 (Ala.2001), quoting Bracewell v. State, 447 So.2d 815, 821 (Ala.Crim.App.1983), aff'd, 447 So.2d 827 (Ala.1984), cert. denied, 469 U.S. 980, 105 S.Ct. 382, 83 L.Ed.2d 318 (1984).
There is no evidence that the trial court's disallowance of this specific question resulted in any prejudice to Stallworth. The trial court did not abuse its discretion.

VIII.
Stallworth argues that the trial court erred in denying his motion to suppress his statements to police. The court held an extensive suppression hearing on Stallworth's motion to suppress. At the end of the hearing the trial court denied the motion.
"When reviewing a claim questioning the voluntariness of a statement we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.), on remand, 718 So.2d 731 (Ala.Crim.App.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). The McLeod court stated:
"`For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
"`....
"`It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe[ v. Connecticut], 367 U.S. *1149 568, at 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 [(1961)], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, "if his will has been overborne" by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added in McLeod).
"`The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the "totality of the circumstances." Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433, (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77, (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35, (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872, (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added in McLeod).'"
McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ____, ____ (Ala.Crim.App.2000).
The evidence concerning the facts surrounding Stallworth's statements to police was conflicting. Sgt. Warren Stewart of the Alabama Bureau of Investigation and Capt. Jimmy Flanagan of the Foley Police Department testified that they interviewed Stallworth after he was arrested at his house on an outstanding warrant for a probation violation. Stallworth was questioned on the day of his arrest, held overnight because of the outstanding warrant on his probation violation, and questioned again the next day. On the occasion of both questionings Stallworth signed a Miranda[5] rights forms indicating that he had read and understood his rights and another form stating that he was waiving those rights. Both Sgt. Stewart and Capt. Flanagan testified that they did not offer Stallworth any reward, make any threats, or threaten his family in any way. Both testified that Stallworth was not deprived of food or the use of bathroom facilities and that he was allowed to smoke a cigarette. Sgt. Neil Holcombe of the sheriff's department also testified that he observed the questioning for about 20 minutes and said that the officers did not threaten or coerce Stallworth. Stallworth testified at the suppression hearing and refuted Stewart and Flanagan's testimony. He said that the two told him that if he did not confess they would make sure that he went to prison and that his fiancée, Deborah Pickens, and his daughter were taken away from him. He said that they told him what to say and that if he said he was at the stores he would be placed in rehabilitation and his child would not be taken from him. The trial court heard the testimony *1150 and ruled that the State had met its burden of showing that the confession was voluntary.
Here, the evidence was conflicting. "It is true, absent clear error, the trial court's credibility choices on issues of fact at suppression hearings are binding on this Court. Powell v. State, 624 So.2d 220 (Ala.Cr.App.1993)." State v. Hill, 690 So.2d 1201, 1204 (Ala.1996), on remand, 690 So.2d 1207 (Ala.Crim.App.1996). On appeal, Stallworth argues that there was more than enough evidence to show that his statement was coerced. In brief, he specifically cites the testimony of his expert, Dr. Richard Ofshe, concerning the psychological effects that threats to family members can have on a person. However, before the trial court ruled on the motion to suppress, the following occurred: "[Defense counsel]: [W]e prefer that you make the decision as to the suppression without Doctor Ofshe's testimony." (R. 901.) Thus, this testimony cannot be used to consider the validity of the trial court's ruling on the motion to suppress. "A trial court's ruling will be reviewed in relation to the evidence presented to it prior to its ruling." Carpenter v. State, 581 So.2d 1277, 1278 (Ala.Crim.App.1991). Thus, we have not considered Dr. Ofshe's testimony on this issue.
There is more than sufficient evidence in the record indicating that the trial court did not abuse its discretion in denying the motion to suppress Stallworth's statements to police. We must defer to the trial court's ruling on questions involving the credibility of witnesses.

IX.
Stallworth argues that the trial court erred in failing to instruct the jury not to read a newspaper or listen to radio accounts of the trial. Specifically, he states that on the first day of voir dire, when the prospective jurors went to lunch, the trial court failed to give them any cautionary instructions.
There was no objection when the venire was excused; therefore, we review this issue for plain error. Rule 45A, Ala. R.App.P.
Before any voir dire questioning, the trial court excused the venire for a lunch break. The court did not give a cautionary instruction. However, after the venire returned the members were questioned about any knowledge that they had about the case. Moreover, when a jury was ultimately selected, the trial court instructed its members according to Rule 19.3(b), Ala. R.Crim.P. This rule states:
"In all cases, the court shall admonish the jurors that they are not:
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberation;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
"(4) To form or express any opinion on the case until it is submitted to them for deliberation."
Rule 19.3 does not provide that the trial court must admonish the prospective jurors before a jury is chosen. Neither is there any evidence in the record that Stallworth has suffered any prejudice. Immediately after the lunch break, the venire was questioned about any knowledge that the members had about the case. There was no plain error in the trial court's *1151 failing to admonish the venire before a lunch break.

X.
Stallworth argues that the trial court erred in allowing what he says were inflammatory and prejudicial photographs of the victims to be presented to the jury. He contends that the close-up photographs of the victims' bodies were unduly prejudicial and should have been excluded.
"Photographic evidence is admissible in criminal prosecutions if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The admission of photographic or videotape evidence is completely within the discretion of the trial court. Stewart v. State, 443 So.2d 1362, 1364 (Ala.Cr.App.1983). Matters resting in the sound discretion of the trial court will not be disturbed, absent a clear abuse of discretion. Pace v. State, 284 Ala. 585, 226 So.2d 645 (Ala.1969).
"`The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative.' Land v. State, 678 So.2d 201, 207 (Ala.Cr.App.1995). Photographic exhibits are admissible even though they are demonstrative of undisputed facts. Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).
"`Gruesomeness becomes objectionable in a photograph only where there is distortion of either of two kinds; first, distortion of the subject matter as where necroptic or other surgery caused exposure of nonprobative views, e.g., "massive mutilation," McKee v. State, 33 Ala.App. 171, 31 So.2d 656 [(Ala.Ct.App.1947)]; or second, focal or prismatic distortion where the position of the camera vis-á-vis the scene or object to be shown gives an incongruous result, e.g., a magnification of a wound to eight times its true size, Wesley v. State, 32 Ala.App. 383, 26 So.2d 413 [(Ala.Ct. App.1946)].'

"Braswell v. State, 51 Ala.App. 698, 701, 288 So.2d 757 (1974).
"`Rule 403, Ala.R.Evid., provides that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." A determination of whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice rests within the sound discretion of the trial court. Hayes v. State, 717 So.2d 30 (Ala.Crim.App.1997).
"`In Fisher v. State, 665 So.2d 1014 (Ala.Crim.App.1995), we stated:
"`"As to the appellant's contention that the photographs are prejudicial, all evidence that tends to make out the case of one litigant is prejudicial to the opposing litigant. If it were not in some way prejudicial to the opposing party, one would question its relevance. An authenticated photograph may be received into evidence if it tends to `prove or disprove some disputed issue, ... illustrate or elucidate some relevant fact or ... corroborate or disprove some other evidence offered or to be offered.' C. Gamble, McElroy's Alabama Evidence, § 123.03(1) (4th Ed.1991)."

*1152 "`665 So.2d at 1019.'

"Powell v. State, 796 So.2d 404 (Ala. Crim.App.1999)."
Acklin v. State, 790 So.2d 975, 997-98 (Ala. Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.2001), cert. denied, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001). We have reviewed the photographs of both victims. The photographs were admissible to show the cause of the victims' deaths and the extent of the victims' injuries. The trial court did not abuse its discretion in allowing the photographs to be received into evidence.

XI.
Stallworth argues that Alabama's system of compensating court-appointed attorneys, which provides a cap of $1,000 for out-of-court work, violates state and federal constitutional law. Specifically, he asserts that it violates the separation-of-powers doctrine, constitutes a taking without just compensation, deprives indigent capital defendants of the effective assistance of counsel, and violates the Equal Protection Clause and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
"The Alabama Supreme Court has rejected these arguments. See Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), and Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979).
"Section 15-12-21, was recently amended to increase the attorney fees in all appointed cases. After June 10, 1999, an attorney appointed to represent a defendant charged with a capital offense has no cap on the attorney fees that he can collect."
Johnson v. State, 820 So.2d 842, 870 (Ala. Crim.App.2000), aff'd, 820 So.2d 883 (Ala. 2001).

XII.
Stallworth argues that the trial court erred in admitting evidence he says was hearsay at the guilt phase of his trial. Specifically, he challenges the admission of Christina Waters's testimony to the effect that Stallworth, while paying his electric bill at Riviera Utilities, overheard another woman talking on the telephone about Dukes's death. The following occurred:
"Q: [District attorney]: Okay. Tell the ladies and gentlemen the best you can recall what the conversation was that you heard.
"[Defense counsel]: And, Judge, we object to that.
"[District attorney]: Your Honor, it was in the presence of the defendant, and he has a reaction to it. And we submit under the rules of evidence it is admissible.
"The Court: Overrule the objection.
"Q: Go ahead.
"A: Okay. I was standing there taking the gentleman's money, and the lady in the background there, another lady in the office was talking to somebody else over the phone, that Mrs. Dukes had been killed.
"Q: And did you hear it from where you were standing?
"A: Yes.
"Q: How close was he to you?
"A: Just over the counter. Right there.
"Q: Could you clearly hear it?
"A: Yes.
"Q: After that was said concerning Mrs. Dukes, what reaction did the defendant, I mean, excuse me, did the man have that was paying the bill?

*1153 "A: Kind of shocked, taken aback by it, you know.
"Q: Did he say anything?
"A: Yes. After we heard it, he stood back and he said, `Oh, man,' and he hung his head. And I just continued to take the money."
(R. 2686-87.)
Initially, we note that Stallworth made only a general objection to the introduction of this evidence; he did not specify his legal basis for the objection. Therefore, we apply a plain-error analysis. Rule 45A, Ala.R.App.P.
Stallworth argues that the "the testimony about what the other woman said about the Dukes killing is hearsay, not subject to any exception" (Stallworth's brief, p. 36), and, therefore, that it was not admissible.
Rule 801, Ala.R.Evid., defines hearsay:
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
The testimony that the person overheard on the telephone was talking about Dukes's murder was correctly received into evidence because it was not offered to prove the truth of the matter asserted. This testimony was offered to explain Stallworth's actions upon hearing the remarks about Dukes's murder. This was admissible evidence. "`[The hearsay rule] does not exclude extrajudicial utterances offered merely to prove the fact of the making or delivery thereof, or to explain subsequent conduct of a hearer.'" Ashford v. State, 472 So.2d 717 (Ala.Crim. App.1985), quoting 22A C.J.S. Criminal Law § 718 (1961).
Moreover, even if this evidence was hearsay, we would find no reversible error. It was undisputed that Dukes had been murdered. She had been stabbed over 40 times. Thus, any admission of a statement that Dukes had been murdered was cumulative of other evidence. Thus, its admission would have been harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
There was no plain error in the admission of this testimony.

XIII.
Stallworth argues that the prosecutor engaged in "pernicious misconduct that violated Mr. Stallworth's rights to due process, a fair trial, and a reliable sentencing hearing." (Stallworth brief, p. 51.) He cites several different instances to support this contention.
As this Court stated in Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
"We quote the following from this Court's opinion in Davis v. State, 494 So.2d 851, 853 (Ala.Cr.App.1986), which states the role of the prosecutor:
"`It is, of course, the duty of every prosecutor to represent the interests of the state zealously, vigorously, and earnestly. His "responsibility [as] a public prosecutor differs from that of the usual advocate; [his] duty is not merely to convict, but also to protect the innocent." EC 7-13, Alabama Code of Professional Responsibility. "The prosecuting attorney owes a duty to exercise his full powers in furtherance of society's valid and strong interest in enforcement of criminal laws, not only in seeing that the guilty are punished but that criminal acts by others are discouraged by example of such punishment." Sprinkle v. State, 368 So.2d 554, 561 (Ala. Cr.App.1978), writ quashed, 368 So.2d 565 (Ala.1979).

*1154 "The prosecutor's responsibility is eloquently explained in the following passage[:]
"`"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law. The twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
"`"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

"`Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed.2d 655 (1935).'
"Initially, we observe that the trial court instructed the jury that comments of counsel were not evidence in the case. Also, we have repeatedly stated that, `"Statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth."' Stephens v. State, 580 So.2d 11, 22 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988). Moreover, a prosecutor is free to argue his impressions of the evidence. Freeman, supra.
"`"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala. 1981)."'

"Callahan v. State, 767 So.2d 380, 392 (Ala.Cr.App.1999). For an argument by counsel to amount to reversible error it must `have so infected the trial with unfairness, taken in the context of the whole trial, that the appellant is entitled to a new trial. See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).' Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994)."
With these standards of review in mind, we evaluate the challenged comments and arguments of the prosecutor.

A.
Stallworth argues that the prosecutor improperly commented on his failure to call a witness when he made the following argument in closing at the guilt phase:
"I don't know if you have ever been exposed to DNA evidence before. It's *1155 relatively new. But he told you of the chances of this being her blood. I believe he related, and you will remember the exact numbers, if one of you has written it down, 150-something million to one. And I think that's close. And I said, that includes all men and women, and it's roughly fifty-fifty, just double it. So, it's around three hundred million to one. And he said, I wouldn't quibble over a few million, pocket change is what I asked him, pocket change, the odds of, I submit to you, that that was the blood of Nancy Dukes. And it was on the jacket of Calvin Stallworth. And he can't explain it away. And neither can his professor from Berkeley. It won't wash. Unless. Unless. Unless this jury believes this man planted the blood on that jacket. Unless you want to believe that. It won't wash."
(R. 4562-63) (emphasis added). Stallworth also challenges the following comment made in the prosecutor's rebuttal closing argument in the guilt phase:
"And I'm going to tell you something. I did not believe that [defense counsel] would ever tell you that DNA was junk science. You are talking about somebody that's trying to suggest something to you.
"I want you to go back in your memory and see if you believe that DNA, that is utilized by forensics and testified to you that was used by forensic laboratories all over this country, and our forensic lab, matched up, and was compared to every crime lab in the country, including the FBI crime lab, is junk science.
"And the reason I submit he said that without any evidence of itBy the way, he didn't put anybody on to say it was. But I submit to you that he didn't put anybody on because he couldn't find anybody in this country to say it but himself."

(R. 4633-34) (emphasis added).
Stallworth argues that these remarks were comments on his failure to call witnesses and that they also resulted in the prosecution's shifting the burden of proof to him.
Initially, we note that Stallworth did not object to the alleged errors he now makes on appeal; therefore, we are limited to applying a plain-error analysis. Rule 45A, Ala.R.App.P.
As we stated in Griffin v. State, 790 So.2d 267, 327 (Ala.Crim.App.1999), rev'd on other grounds, 790 So.2d 351 (Ala. 2000):
"`Reference to a particular witness's failure to testify is improper if the witness is equally available to both parties.' Pacifico v. Jackson, 562 So.2d 174, 177 (Ala.1990); accord Helton v. State, 433 So.2d 1186, 1189 (Ala.Cr.App.1983); Daniels v. State, 650 So.2d 544, 560 (Ala. Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995). However, we conclude that the prosecutor's comment was directed at Griffin's failure to call a particular kind of witness. In that light, and when read in conjunction with the prosecutor's entire closing argument, we conclude the comment was directed to Griffin's failure to establish his alibi witnesses or to develop his defense."
The remarks were not directed at any particular witness's failure to testify but were directed at the defense's failure to call a DNA expert to rebut the State's DNA evidence. Moreover, after reading the remarks made by defense counsel concerning the DNA evidence, we believe that the second comment was a reply-in-kind to the remarks made by defense counsel. Defense counsel had called DNA evidence *1156 junk science. Certainly, the prosecutor was free to comment on the credibility of the DNA evidence.
"`Replies in kind are generally permissible. Pittman v. State, 153 Ala. 1, 45 So. 245 (1907); Bates v. State, 468 So.2d 207 (Ala.Cr.App.1985). Allowing replies in kind rests within the discretion of the trial court, McCullough v. State, 357 So.2d 397 (Ala.Cr.App.1978), and wide latitude is usually given regarding replies in kind. Richardson v. State, 354 So.2d 1193 (Ala.Cr.App.1978); Evans v. State, 338 So.2d 1033 (Ala.Cr. App.1976); Lane v. State, 46 Ala.App. 637, 247 So.2d 679 (1971); Moody v. State, 40 Ala.App. 373, 113 So.2d 787 (1959); Windham v. State, 35 Ala.App. 547, 50 So.2d 288 (1950); Gills v. State, 35 Ala.App. 119, 45 So.2d 44, cert. denied, 253 Ala. 283, 45 So.2d 51 (1950); York v. State, 34 Ala.App. 188, 39 So.2d 694 (1948), cert. denied, 252 Ala. 158, 39 So.2d 697 (1949); Walker v. State, 33 Ala.App. 614, 36 So.2d 117 (1948). "When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply. What otherwise would have been improper argument by the prosecutor will be seen as harmless." DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469-70 (1982-83).'"
Blackmon v. State, 574 So.2d 1037, 1040 (Ala.Crim.App.1990).

B.
Stallworth argues that the prosecutor improperly argued facts not in evidence.
First, he argues that the prosecutor argued that Stallworth had been out of work for three months when his fiancée testified that he had been out of work for one month.
There were no objections to the challenged arguments; thus, we are limited to a plain-error analysis. Rule 45A, Ala. R.Crim.P.
The following occurred during the prosecutor's closing argument:
"I submit to you the inference from the evidence is consistent with that, even after I redirected Mrs. Pickens. Her testimony was, as I recall, that Calvin left that day with a blue jacket with a hood on it. That's what he had on. And that he had been out of work for about three months, a month to three months, and I think that's what everybody has said, even Calvin, before the Morton case."
(R. 4544) (emphasis added). Stallworth mischaracterizes the argument. The prosecutor's argument was supported by evidence presented at trial through Stallworth's and his fiancée's testimony.
Second, Stallworth argues that, "The prosecutor then distorted the evidence from Shawn Stanfield, who testified that he saw a man running toward the trail behind the store who was wearing `a puffy jacket,' not a hooded sweatshirt. The prosecutor argued that this testimony was in fact words from defense counsel's mouth, rather than the witness's actual testimony, which it was."[6] (Stallworth's brief, p. 54.)
However, this remark was supported by facts that were presented during Stanfield's testimony. The following occurred:
"Q [Defense counsel]: And he had on a black jacket?
"A: Yes, sir.
"Q: What kind of jacket?

*1157 "A: Well, it was a hooded, winter-type jacket.
"Q: Like a sweatshirt or puffy jacket.
"A: Yes, sir, puffy jacket."
(R. 2767-68.) This information was elicited when defense counsel was leading the witness on cross-examination. Therefore, the prosecutor's comment was supported by the record.
Third, Stallworth argues that the prosecutor misstated the evidence when he said that Stallworth liked to "shoot dice and sell drugs." He contends that there was no evidence to support this assertion.
The record reflects that Stallworth testified in his own defense and stated that he supported himself by playing dice and selling marijuana. The prosecutor's argument was supported by Stallworth's own testimony. There was no improper argument here.

C.
Stallworth argues that the prosecutor improperly commented on the punishment that Stallworth should receive when he made the following comment in his guilt-phase closing argument:
"And I believe that if you fairly and honestly and reasonably with good common sense assess the overwhelming evidence which the State of Alabama has presented to you, and you do it consistent with the law as Judge Reid will hand you, that you will find that Calvin Stallworth, with the intent to commit a murder, in a mean and despicable and in cowardly acts, went into two different convenience stores in Baldwin County on December 4 and December 16, 1997, and there and then wielded a knife or other sharp instrument against the bodies of two helpless, unarmed women, and there and then stabbed them with sufficient force and sufficient direction and sufficient intensity to end their lives. For money. And for that, he should face Alabama's electric chair."

(R. 4647-48) (emphasis added).
There was no objection to the above argument; therefore, we look for plain error. Rule 45A, Ala.R.App.P.
We stated in McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ____ (Ala.Crim.App.2000):
"`Punishment is "an improper consideration at the guilt phase of [a capital] trial." Berard v. State, 486 So.2d 476, 479 (Ala.1985)[, on remand, 486 So.2d 482 (Ala.Crim.App.1986)].' McNair v. State, 653 So.2d 320, 338 (Ala.Crim.App., 1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995)."
After reading the entire argument, we conclude that the remark was not that Stallworth should be sentenced to death but that he should be convicted of capital murder so that he would have to face the death penalty at the penalty phase. There was no improper argument here.

D.
Stallworth argues that the prosecutor improperly vouched for the veracity of two state witnesses. Stallworth contends that he improperly vouched for the credibility of one witness when he said that the witness was "a big old block of a man. Mr. Underwood. They have lived in this county for generations." (R. 4518-19.)
There was no objection to this comment; therefore, we look for plain error. Rule 45A, Ala.R.App.P.
This was a comment about Thomas Underwood, a state witness, who testified that he was with Nancy Dukes when she died. The prosecutor's comments about Underwood were supported by the testimony that was elicited from this witness during *1158 his direct examination. This witness testified that he and his family had been in the county for generations. The prosecutor was not vouching for the credibility of this witness.
As we stated in DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994):
"A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. `[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.' Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
"`"Attempts to bolster a witness by vouching for his credibility are normally improper and error." ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.... Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.'

"United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).
"Here, the district attorney did not give any personal assurance of McCant's veracity and did not imply that he had information that had not been presented to the jury that supported McCant's testimony. `The credibility of a witness is a legitimate subject of criticism and discussion.' Flint v. State, 370 So.2d 332, 335 (Ala.Cr.App.1979). Here, as in Smith v. State, 344 So.2d 1239, 1242 (Ala.Cr.App.), cert. denied, 344 So.2d 1243 (Ala.1977), `[t]he prosecutor's remarks were grounded on some testimony given by the witness himself.' See also Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) (reference in closing argument to defendant as a `bald face liar' was `a hard blow but it was not foul')."
Stallworth also argues that the prosecutor vouched for the credibility of Olivia Woodyard, a State witness who identified Stallworth as being near the scene of Morton's murder. The following occurred:
"But I think you will look at the question of Olivia Woodyard on either event, either before you or the other event, you will find that she's absolutely sure, no question about it: That was Calvin at that time; very sure that sirens were going off....
"[Defense counsel]: Objection, Your Honor. May we approach, please.
"(Whereupon, the following Bench conference was had:)
"[Defense counsel]: Your Honor, I would like to hand to you the case of Arthur v. State, which clearly says it's reversible error and grounds for a mistrial for a prosecutor to comment on the veracity and truthfulness of a witness.
"[District attorney]: I was going to say whether or not she told you the truth was for you to decide.

*1159 "[Defense counsel]: This gentleman stated she told the truth twice within the last minute.
"The Court: All right. I deny the objection.
"[Defense counsel]: Do you deny my motion for mistrial?
"The Court: Yes, I do. Denied.
"[Defense counsel]: Exception.
"(Whereupon, further closing arguments were heard).
"And concerning Mrs. Woodyard, or any other witness, the jury determines by looking at the witness, and the judge will charge you concerning credibility of all witnesses. And I ask that you examine the credibility of Mrs. Woodyard as she sat under oath on the witness stand, as you would any other witness, and examine whether or not she had any motive."
(R. 4539-41) (emphasis added).
The record reflects that Woodyard was subjected to an extensive cross-examination. Here, the prosecutor did not vouch for this witness's credibility. However, the prosecutor commented on the witness's credibility and argued that Woodyard's testimony on cross-examination showed that Woodyard was confident about her testimony. There was no improper argument.
Moreover, the prosecutor stated, after the objection, that it was the jury's role to determine the credibility of the witnesses. Therefore, the prosecutor cured any possible error by telling the jury that they determined the credibility of witnesses.

E.
Stallworth argues that the "prosecutor needlessly inflamed the jurors by waving a bloody blouse [in front of] them during guilt phase testimony." (Stallworth's brief, p. 57.)
During the examination of Officer Huey Mack, the prosecutor asked Mack to "hold [the shirt] up so the jury can see the texture of the shirt and the degree of blood." (R. 1923.)
There was no objection to this witness's holding the victim's shirt up so the jury could view it. In fact, when the shirt was admitted into evidence defense counsel said that it had no objection. (R. 1923.) We evaluate this issue for plain error. Rule 45A, Ala.R.App.P.
As the Alabama Supreme Court stated in Barbour v. State, 262 Ala. 297, 309, 78 So.2d 328, 339 (1954):
"The clothing of the deceased, as well as that of the accused, [is] usually held admissible on trials of homicides. If tending to elucidate the transaction, to identify any of the parties, to connect the accused with the crime, or to show the character of the wound, motive or intent of the killing, or degree of the crime, whether the killing was self-defense or not, they are admissible. If such objects tend to corroborate or disprove, illustrate or elucidate any other evidence, they are admissible, though such evidence may have a tendency to bias or prejudice the jury, to elicit their sympathy for, or animosity toward either the deceased or the accused. Rollings v. State, 160 Ala. 82, 49 So. 329; Whitaker v. State, 106 Ala. 30, 17 So. 456; Curtis v. State, 118 Ala. 125, 24 So. 111; McCormack v. State, 102 Ala. 156, 161, 15 So. 438; Gassenheimer v. State, 52 Ala. 313; Campbell v. State, 23 Ala. 44; Teague v. State, 245 Ala. 339, 341, 16 So.2d 877, 879; Floyd v. State, 245 Ala. 646, 647, 18 So.2d 392."
The State moved to introduce this shirt into evidence. Defense counsel specifically stated that he had no objection. (R. 1923.) *1160 There was no error in the prosecutor's asking this witness to hold the shirt up so the jury could view it. This was counsel's way of showing the exhibit to the jury. (The witness testified that he did not think anyone should handle the shirt because of the blood.) There is no plain error here.

F.
Stallworth argues that the trial court erred in failing to grant his motion for a mistrial after the prosecutor called defense counsel a liar.
The record reflects that during the cross-examination of State witness Woodyard, the prosecutor and defense counsel had a disagreement regarding the defense's efforts to impeach this witness. The prosecutor maintained that defense counsel was trying to impeach this witness with a comment allegedly not contained in Woodyard's prior statement. There was a disagreement, and the prosecutor apologized for his outburst. The prosecutor commented in his closing argument on what had happened during Woodyard's testimony. Defense counsel then moved for a mistrial.
After looking at the record, we cannot say that the comments so infected the trial with unfairness that Stallworth is entitled to a new trial. The trial court instructed the jury:
"You are not to consider as evidence the indictments that I read to you, the arguments of the attorneys, and any rulings by this court on matters of evidence."
(R. 4668-69.) There is no reversible error here.

G.
Stallworth argues that the cumulative effect of the errors requires a new sentencing determination. We have often stated: "Because we find no error in the specified instances alleged by the appellant, we find no cumulative error." McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ____, ____ (Ala.Crim.App.2000).
Moreover, we have reviewed all of the actions challenged by Stallworth. There is absolutely no evidence that the prosecutor's actions so infected the trial with unfairness that Stallworth was deprived of due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

XIV.
Stallworth argues that the trial court erred in denying his motions for a judgment of acquittal because, he says, there was not sufficient evidence to establish that he had committed two offenses of capital murder.
"In reviewing an appeal from a denial of a motion for a judgment of acquittal, this Court must view the evidence in the light most favorable to the state. Jones v. State, 620 So.2d 129 (Ala.Cr.App. 1993). In addition, the defendant's guilt may be proven by circumstantial as well as direct evidence. Ex parte Lockett, 548 So.2d 1045 (Ala.1989).... If there is a reasonable inference that the state has proven the offense, even by circumstantial evidence, the trial court should submit the case to the jury for it to consider the question of the sufficiency and the weight of the evidence tending to support that inference. McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983)."
Lewis v. State, 741 So.2d 452, 455 (Ala. Crim.App.1999).
A large portion of the evidence presented against Stallworth was circumstantial. "Circumstantial evidence, however, is not inferior or deficient evidence and `will support a conviction as stoutly as direct evidence *1161 as long as such evidence indicates the appellant's guilt.'" Dansby v. State, 675 So.2d 1344, 1348 (Ala.Crim.App.1994), quoting Hughley v. State, 574 So.2d 991, 993 (Ala.Crim.App.1990). "As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence." Smith v. State, 698 So.2d 189, 214 (Ala.Crim.App. 1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).
"`In reviewing a conviction based on circumstantial evidence, this court must view that evidence in a light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.'"
Dozier v. State, 706 So.2d 1287, 1289 (Ala. Crim.App.1997), quoting Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App.), cert. denied, 368 So.2d 877 (Ala.1979).
Specifically, Stallworth argues that in regard to the Dukes robbery/murder there was no evidence that he took anything from Dukes or the store. He does not challenge the evidence to support Dukes's murder.
The evidence established that a hooded jacket seized from Stallworth's house had blood on the inside of one of the sleeves. The blood was identified through forensic testing as matching Dukes's DNA. There was testimony that between $400 and $600 had been in the cash register on the morning of the robbery/murder and that the register appeared to have been forced open. There was evidence that Stallworth gave a statement to police in which he said that he was at the Dukes Parkway Shell station. Moreover, there was evidence that Stallworth paid a delinquent power bill for his fiancée within two hours after Dukes was murderedStallworth had not been working for several weeks before he paid the bill. The evidence clearly showed that the murder was committed in the course of committing a robbery. This case was properly presented to the jury.
Stallworth also argues that there was not sufficient evidence to prove that he either killed or robbed Linda Morton.
The State's evidence established that on December 14, 1997, Stallworth was seen near where Morton was murdered at the time the murder occurred. Also, Stallworth told police that he was at the scene of the murder but that he did not kill Morton. He said that he took the VCR from the store because it would show that he had been in the store. He also told police that on the trail behind the store he found a bag containing money and he took it. There was testimony that $934 was missing from the cash register. Also, a search of Stallworth's home revealed a serrated kitchen knife, which experts testified was consistent with the wounds that both victims sustained.
There was sufficient evidence presented to send both capital cases to the jury. The trial court correctly denied Stallworth's motions for a judgment of acquittal.

XV.
Stallworth argues that the trial court made several errors in its jury instructions in the guilt phase.
When reviewing a trial court's jury instructions, we keep in mind the following principles:
"A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, `"the *1162 court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.' " Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."
Williams v. State, 795 So.2d 753, 780 (Ala. Crim.App.1999), aff'd, 795 So.2d 785 (Ala. 2001). "The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice." Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

A.
Stallworth argues that the trial court erred in failing to give a limiting instruction to the jury under Rule 404(b), Ala.R.Evid. Specifically, he argues that the trial court should have instructed the jury that evidence of one of the crimes was not admissible to show the appellant's guilt as to the other crime but was admissible only for the purpose of proving motive, intent, opportunity, preparation, and common plan or scheme.
Initially, we observe that defense counsel did not object to the trial court's jury instructions in the penalty phase. Therefore, we are limited to evaluating this issue for plain error. Rule 45A, Ala.R.App.P.
This was not a case where Stallworth was tried for one offense and evidence of another offense was offered under any exception to the collateral evidence rule. Rule 404, Ala.R.Evid. Stallworth's two capital indictments were consolidated for trial. The trial court had no obligation to sua sponte give a limiting instruction on other-crime evidence.
Stallworth also argues that the trial court erred in failing to instruct the jury that it had to compartmentalize the evidence of the two separate crimes.
Stallworth did not object to the trial court's failure to give this instruction; therefore we look for plain error. Rule 45A, Ala.R.App.P.
The trial court gave the following instruction:
"Now, ladies and gentlemen, as I told you at the beginning of this case, there are two cases actually being tried at one time. Those two cases were consolidated for trial. You must consider each case as if it were a separate case. And you must consider the evidence that applies to that particular case to that case."
(R. 4661.)
The trial court also separately instructed the jury on each capital charge and gave the jury separate verdict forms for each charge. There is absolutely no evidence in the record that the jury was not fully informed that it was considering two separate and distinct capital cases. There was no plain error here.

B.
Stallworth argues that the trial court's reasonable doubt instruction violated the United States Supreme Court's holdings in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
Initially, we observe that Stallworth did not object to the trial court's jury instruction on reasonable doubt. Therefore, we look for plain error. Rule 45A, Ala. R.App.P.
*1163 In Reeves v. State, 807 So.2d 18 (Ala. Crim.App.2000), cert. denied, 807 So.2d 18 (Ala.2001), we stated the following about the Supreme Court's holdings in Cage and Victor:
"In Cage v. Louisiana, the United States Supreme Court held that an instruction that equated `reasonable doubt' with `grave uncertainty,' and `actual substantial doubt' and stated that what was required to convict was a `moral certainty,' could have led a reasonable juror to interpret the instruction to allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), `the Court "made it clear that the proper inquiry is not whether the instruction `could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it."' Knotts [v. State], 686 So.2d [431] at 459 [(Ala.Crim.App.1995)], quoting Victor, 511 U.S. at 6, 114 S.Ct. 1239 at 1243, 127 L.Ed.2d 583, quoting, in turn, Estelle v. McGuire, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991). The constitutional question is `whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard.' Victor, 511 U.S. at 6, 114 S.Ct. at 1243. In addition, the Supreme Court made it clear in Victor `that, while it did not condone the use of the Cage terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if "`taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury.'"' Lawhorn v. State, 756 So.2d 971, 985 (Ala.Crim.App.1999), quoting Victor, 511 U.S. at 22, 114 S.Ct. at 1251, quoting, in turn, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See also Taylor v. State, 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)(`"Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error."'); and Sockwell v. State, 675 So.2d 4, 23 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996)(`It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage.' (Emphasis added.)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of `reasonable doubt' was correctly conveyed to the jury, we will not find error. See, e.g., Knotts, supra. Here, the trial court's charge, as a whole, correctly conveyed the concept of reasonable doubt to the jury; it did not lessen the State's burden of proof. The trial court's mere use of the phrase `reasonably substantial doubt' cannot be equated with the instruction condemned in Cage, where the reasonable-doubt instruction contained the phrase `actual substantial doubt' as well as the phrases `grave uncertainty' and `moral certainty.' See, e.g., Dobyne v. State, 672 So.2d 1319 (Ala.Crim.App.), opinion after remand, 672 So.2d 1353 (Ala.Crim.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)(upholding a charge using the phrase `reasonably substantial doubt' because it `contained none of the terms' that the United States Supreme Court found questionable *1164 in Victor and reversible in Cage'). The reasonable-doubt instruction in this case was not misleading or confusing, and there was no reasonable likelihood that the jury applied the instruction in an unconstitutional manner. Accordingly, we find no error as to this claim."
Here, the trial court did not use all of the terms that the United State Supreme Court found offensive in Cage. The trial court gave the following instruction:
"This phrase that I am using, reasonable doubt, is self-explanatory. Efforts to further define the term do not always help. However, it may help you some to say that the doubt which would justify an acquittal must be an actual doubt. It must not be a mere guess or surmise, and it must not be a forced or capricious doubt.
"If, after considering all of the evidence in the case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt. And in that event, it would be your duty to convict the defendant.
"Now, the reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural, or speculative doubt, but a reasonable doubt arising from all or any part of the evidence or from a lack of evidence. And it must remain after a careful consideration of the testimony, sure as reasonable, fair-minded, and conscientious men and women would entertain under all of the circumstances.
"Now, ladies and gentlemen, you will observe that the state is not required to convince you of the defendant's guilt beyond all doubt, but beyond all reasonable doubt.
"If, after comparing and considering all of the evidence in the case, your minds are left in such a condition that you cannot say you have an abiding conviction of the defendant's guilt, then you are not convinced beyond a reasonable doubt. And in that event, it would be your duty to acquit the defendant."
(R. 4659-61.) The trial court's instructions concerning reasonable doubt were thorough and correct and did not violate Cage.

C.
Stallworth argues that the trial court erred in failing to instruct the jury that it was to determine the voluntariness of Stallworth's statements to police.
There was no objection to this alleged failure; therefore, we look for plain error. Rule 45A, Ala.R.App.P.
We have examined the trial court's jury instructions and find that Stallworth's argument is not supported by the record. The trial court gave the jury the following instruction:
"With regard to the alleged statement of the defendant, you may consider all of the facts and circumstances surrounding the taking of the alleged statement in determining the weight and credibility which you give to the alleged statement."
(R. 4670-71.) The trial court did instruct the jury that it was to determine the weight and credibility of Stallworth's statement.

D.
Stallworth argues that the trial court erred in failing to instruct the jury on the lesser-included offenses of burglary and theft.
Initially, we note that Stallworth did not request that instructions on burglary and theft be given to the jury. Thus, we evaluate this issue only for plain error. Rule 45A, Ala.R.App.P.
"Anyone charged with a greater offense has the right to have a charge on any *1165 lesser offenses when there is a reasonable theory based upon the evidence to support the accused's position. Anderson v. State, 507 So.2d 580, 582 (Ala.Cr.App.1987) The trial court may refuse to charge on such a lesser included offense only when: (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense; or (2) the charge would tend to mislead or confuse the jury. Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988)."
Turner v. State, 708 So.2d 232, 234 (Ala. Crim.App.1997).
Stallworth argues that he was entitled to an instruction on burglary. However, under the facts of this case, burglary was not a lesser-included offense of robbery/murder. Stallworth was charged with two counts of robbery-murder for robbing and killing the employees of two convenience stores.[7] The trial court's failure to sua sponte give an instruction on an offense that was not included in the capital-murder indictments was not error.
There was also no rational basis for giving an instruction on theft. There was no evidence presented that the robberies and the murders were separate and distinct crimes. "The appellant was also not entitled to have the jury charged on the lesser included offense of robbery [or theft]. Because there was a killing in the course of and in furtherance of a robbery, `[i]t is clear ... that the appellant is at least guilty of felony murder.' Kinder v. State, 515 So.2d 55, 72 (Ala.Cr.App. 1986)." Tucker v. State, 650 So.2d 534, 536 (Ala.Crim.App.1994). Furthermore, no felony-murder charge should have been given because the evidence showed that each victim was stabbed multiple times. This was not a situation where an unintended death occurred during the course of a robbery.
Moreover, instructing the jury on any lesser-included offense was not consistent with Stallworth's defense at trial. Stallworth argued that he did not commit the crimes, and he presented an alibi defense. "When instructions are inconsistent with the defense strategy, there is no error in failing to give the challenged instruction." Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), citing McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1997), aff'd, 781 So.2d 330 (Ala.2000).
The trial court committed no plain error in failing to sua sponte give instructions on burglary and theft.

Penalty-Phase Issues

XVI.
Stallworth argues that he was prejudiced when the prosecutor informed the jury that its verdict in the penalty phase was a recommendation. He contends that in doing so the prosecutor violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
Initially, we note that the appellant did not object to the prosecutor's referring to the jury's penalty-phase verdict as a recommendation. Thus, we review this issue for plain error. Rule 45A, Ala. R.App.P.
As we stated in Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999), aff'd, 789 So.2d 941 (Ala.2001):
"[I]t is not reversible error for a prosecutor to comment on Alabama's statutory procedure for trying a capital murder *1166 case. See Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).
"`The appellant contends that the prosecutor and the trial court violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by informing the jury that a conviction for capital murder would carry a punishment of either life imprisonment without parole or death, and that the jury would be required to determine the appropriate sentence. Immediately following the administering of the oath to the venire, the trial court informed the veniremembers that if the appellant was found guilty of capital murder, "then it [would] be the job of the jury to determine whether the appropriate punishment in the case is life in prison without parole or death by electrocution." Immediately after the jury was sworn, the prosecutor, in his opening statement, informed the jurors that a conviction for capital murder "would carry a punishment of either life in the penitentiary without parole or death by electrocution." The appellant argues that it is inappropriate for a jury to be considering punishment issues during guilt-phase deliberations, and that such a practice "relieves the state of its burden of proving every element of the offenses beyond a reasonable doubt." Again, no objection was made in the trial court to these comments; therefore, we review this issue under the plain error rule.

"Caldwell v. Mississippi held that it is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere. In the instant case, the comments of the trial court and the prosecutor were intended to inform the veniremembers and the jurors of the nature of the case about to be tried and the general procedures that would be followed. It is not error for the trial court to instruct the jury as to its role in the sentencing process. See e.g., Ex parte Hays, 518 So.2d 768 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988); Kuenzel v. State, 577 So.2d 474 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Martin v. State, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The comments did not diminish or detract from the jury's role and responsibility in the proceedings. The jurors could not have reasonably interpreted the comments to mean that the state was relieved of its burden to prove every element of the offenses charged beyond a reasonable doubt, as the appellant contends. We find no error in the proceedings in reference to the comments referred to above, and certainly no plain error.'

"Williams, 710 So.2d at 1325."
No error occurred here.

XVII.
Stallworth argues that the trial court erred in failing to instruct the jury that it could consider mercy when it sent back the question, "If we know the aggravating circumstances outweigh the mitigating circumstances, are we obliged to obey that by law and sentence him to death?" (R. 4759.)
There was no objection; therefore, we are limited to assessing whether there is plain error. Rule 45A, Ala.R.App.P.
*1167 In Alabama, a capital jury cannot arbitrarily consider mercy in arriving at a sentence. As we stated in Gaddy v. State, 698 So.2d 1100, 1142 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997):
"Because the requested charge by the appellant suggests that the jury recommend life without parole arbitrarily and based solely on mercy, the instruction was improper.
"`The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an "unfettered option" to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted.'

"Williams v. State, 601 So.2d 1062, 1081 (Ala.Cr.App.1991). In Alabama, the jury must consider any relevant aggravating circumstances and mitigating circumstances, including any non-statutory mitigating circumstances introduced by the appellant that are relevant. The weight to be accorded the circumstances is a matter for the jury and the record indicates that the jury was properly instructed on how to weigh the circumstances...."
The jury was instructed that it could consider anything in mitigation. The jury was also instructed that the aggravating circumstances and the mitigating circumstances had to be weighed before considering whether a sentence was appropriate. The trial court's instructions were consistent with Alabama law.

XVIII.
Stallworth argues that the trial court's instruction on the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel" was unconstitutional because, he says, it "did not channel the jury's discretion adequately." (Stallworth's brief, p. 92.)
Stallworth did not object to the trial court's instruction on this aggravating circumstance. Thus, we look only for plain error. Rule 45A, Ala.R.App.P.
The trial court gave the following instruction:
"The second aggravating circumstance that you may consider is whether the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.
"The term `heinous' means extremely wicked or shockingly evil.
"The term `atrocious' means outrageously wicked and violent.
"The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"What is intended to be included in this aggravating circumstance [are] those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous or atrocious, any brutality involved in it must exceed that which is normally present in any capital offense.
"For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim.
"All capital offenses are heinous, atrocious, and cruel to some extent.
"What is intended to be covered by this aggravating circumstance is only *1168 those cases in which the degree of heinousness, atrociousness, or cruelty exceed that which will always exist when a capital offense is committed."
(R. 4735-36.)
The trial court's instructions on this issue were both thorough and accurate. We approved a substantially similar jury instruction in Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), cert. granted, [Ms. 1000763, May 1, 2001] ___ So.2d ____ (Ala.2001). In Broadnax, we stated:
"The trial court's charge complies with the [Ex parte] Kyzer[, 399 So.2d 330 (Ala.1981)] standard. The trial court specifically informed the jury that this aggravating circumstance was limited to `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' This standard has been consistently held to adequately narrow this circumstance as required by the Eighth Amendment."
The trial court committed no error in its jury instructions on this aggravating circumstance.

XIX.
Stallworth argues that the trial court erred in failing to answer a question that the jury had about mitigating evidence. The record reflects that the following occurred:
"The Court: Now, the bailiff has already handed me another question as they were walking out.
"The question is: `Must the mitigating circumstances be voiced?'
"[Defense counsel]: No.
"[District attorney]: No. That's right, it's no.
"The Court: And the second question: `Please read examples of mitigating circumstances.'
"[District attorney]: And I don't have any objection to your doing that in the jury room.
"The Court: No, I'd rather bring them back in the courtroom.
"All right. They are talking about what they want. And we'll just wait.
"(Jury deliberations recommenced at 5:55, p.m.)
"The Court: All right. The jury has a verdict, if y'all want to be assembled.
"All right. They don't have to state their verdict aloud out in front of the courtroom. Well, I'm going to poll the verdict, and not ask which way they did it.
"All right. Bring the jury in.
"(Jury in at 5:57, p.m.)"
(R. 4765-66.)
Initially, we observe that Stallworth never objected to the trial court's actions he now challenges on appeal. Therefore, we apply a plain-error analysis. Rule 45A, Ala.R.App.P.
Stallworth's argument implies that the trial court refused to answer the questions. That is not the case, as the record clearly reflects. It appears that the jury was returning to the jury room after the trial court had answered three questions and the trial court stated that the jury was talking about what it wanted to talk about and the court would wait on them. Only two minutes elapsed before the jury returned with a verdict. (R. 4766.) This was not the situation described by Stallworth in his brief. There was no evidence of any confusion on the part of the jury. The jury had previously asked the trial court, "If we know the aggravating circumstances outweigh the mitigating circumstances, are we obliged to obey that (sic) by law and sentence him to death?" (R. 4759.) It appears from the record that a majority of the jurors had before the question *1169 was posed decided that the aggravating circumstances outweighed the mitigating circumstances. Moreover, the trial court's jury instructions on mitigating circumstances and the weighing of the mitigating and the aggravating circumstances were both thorough and accurate. The trial court read the list of statutory mitigating circumstances, explained each one, and also gave the following instruction:
"In addition to the mitigating circumstances, previously specified, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."
(R. 4745.) The trial court then, in great detail, instructed the jury that the mitigating circumstances only had to be proven by a preponderance of the evidence. The trial court also polled the individual jury members to determine if the announced verdict was their verdict.
In Boyd v. State, 746 So.2d 364 (Ala. Crim.App.1999), Boyd argued that his trial counsel was ineffective for not objecting when the trial court refused to clarify the distinction between murder and capital murder. We stated:
"`During the deliberations at Mr. Boyd's capital trial, the jury returned a note to the trial court stating `Could we have distinction between murder and capital murder?'... The Court refused to answer the question, and, instead, indicated that the terms had already been defined and that the jury should use its own recollection of the definitions to determine the distinction.... Without receiving any further instruction, the jury returned with a verdict of guilty as charged in the indictment. The jury was allowed to return a guilty verdict of capital murder even though it had indicated it did not understand the charge of capital murder.'

"(Appellant's brief at p. 93.) (Emphasis in appellant's brief.) The substantive claim was decided adversely to Boyd on direct appeal. We stated:
"`Furthermore, we do not find the trial judge's refusal to give additional instructions to the jury on murder and capital murder to be error, since the trial judge thoroughly instructed the jury on these matters in his oral charge to them. There is no basis of error to reversal shown here.'
"[Boyd v. State,] 542 So.2d 1247, 1259 (Ala.Cr.App.1988)."
Certainly, the facts presented in Boyd, in which this Court affirmed the conviction and denied postconviction relief, were a great deal more egregious than those presented in this case. After evaluating the thorough jury instructions, we hold that there was no plain error in the trial court's failure to answer the jury's question. See Boyd.

XX.
Stallworth argues that the trial court erred when, he argues, it coerced the jury to reach a verdict in the penalty phase; he argues that its instruction violated the Supreme Court's holding in Ex parte Giles, 554 So.2d 1089 (Ala.1987).
There was no objection to the trial court's instruction; therefore we look for plain error. Rule 45A, Ala.R.App.P.
The record reflects that 18 minutes after the jury had retired to begin deliberations in the penalty phase, the jury returned with three questions. (R. 4757.) The jury asked the court to clarify the numbers necessary to render a decision, it asked what to do if it did not have those numbers, and it asked if it was obliged to set the sentence at death if the aggravating *1170 circumstances outweighed the mitigating circumstances. The trial court recharged the jury on weighing the aggravating circumstances and the mitigating circumstances. The following then occurred, "And with regard to the question: `What do we do if we cannot meet these numbers?' Ladies and gentlemen, I must instruct you to continue your deliberations until you reach a verdict." (R. 4764.)
Stallworth relies on the Supreme Court's opinion in Giles to argue that the trial court coerced the jury to return a death sentence and that that sentence must therefore be vacated. The facts of this case are easily distinguishable from those in Giles. Giles was tried under the previous capital-murder statute, which provided that a recommendation of death had to be unanimous (former § 13-11-1 through § 13-11-18). In Giles, the jury had been deliberating for about two and one-half hours when it returned to the courtroom. The foreman told the court that the jury was "hopelessly deadlocked" and was awaiting instructions from the court. The trial court then instructed the jury that it would continue to deliberate. We stated:
"Under Alabama law, `a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used.' Showers v. State, 407 So.2d 169, 171 (Ala.1981). In a capital case, however, under the old Alabama death penalty statute, which contemplated a unanimous jury verdict, but in its absence, provided for the imposition of a sentence of life imprisonment without parole, the mere fact that the court instructs the jury to deliberate further, after what the jury characterizes as a `deadlock' has occurred, impermissibly suggests which way the verdict should be returned."
Giles, 554 So.2d at 1093.
Here, the questions posed by the jury clearly reflected that the jurors were not sure about the numbers needed for either a sentence of death or of life imprisonment without parole. The jury never informed the trial court that it was unable to reach a verdict. Also, the trial court polled the individual jurors when it announced its verdict. This case is not governed by Giles.
Moreover, the trial court did not give an Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), charge. The trial court did not charge the jury to resolve its differences and reach a verdict. The trial court was never informed that the jury had reached any verdict. The trial court committed no plain error here.

XXI.
Stallworth argues that double counting an element of the capital offense, here robbery, both as an element and as an aggravating circumstance violates his constitutional rights.
This court has consistently held that this practice is constitutional. As we stated in Hall v. State, 820 So.2d 113 (Ala.Crim.App. 1999):
"Use of an element of the capital offense as an aggravating circumstance is known as `double-counting' or `overlapping' and has repeatedly been upheld. Stewart v. State, 730 So.2d 1203 (Ala.Cr. App.1997), aff'd, 730 So.2d 1246 (Ala. 1999); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burton v. State, 651 So.2d 641 (Ala.Cr. App.1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 *1171 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel, supra. This issue is without merit."

XXII.
Stallworth argues that a sentence to death in Alabama's electric chair constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.
"Alabama's method of execution has withstood repeated constitutional attacks. See Jackson v. State, 836 So.2d 915 (Ala.Cr.App.1999); Williams v. State, 627 So.2d 985 (Ala.Cr.App. 1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Wright v. State, 494 So.2d 726 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987)."
Broadnax v. State, 825 So.2d 134, 223-24 (Ala.Crim.App.2000).

XXIII.
Stallworth argues that Alabama's capital-sentencing statute is unconstitutional because it does not state what weight the judge must give the jury's recommendation. Specifically, he argues that the statute violates the Eighth Amendment and the Fourteenth Amendment.
These same questions have been answered by our Supreme Court and the United States Supreme Court. As the Alabama Supreme Court stated in Ex parte Taylor, 808 So.2d 1215, 1218 (Ala. Crim.App.2001):
"The Court of Criminal Appeals stated that `[t]hese precise issues have been decided adversely to Taylor by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).' Taylor v. State, 808 So.2d 1148 (Ala.Crim.App. 2000). In Harris, the Supreme Court reviewed Alabama's capital-sentencing procedure, which requires the trial judge to `consider' the jury's advisory verdict, but does not require the trial judge to give that verdict any particular weight. See § 13A-5-47, Ala.Code 1975. The Supreme Court held `that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict,' 513 U.S. at 512, 115 S.Ct. 1031, and it upheld Alabama's capital-sentencing statute. Thus, the Court of Criminal Appeals was correct in stating that the Supreme Court has expressly rejected Taylor's Eighth Amendment claim.
"The Supreme Court noted in Harris, however, that the petitioner in that case `[did] not bring an equal protection claim.' 513 U.S. at 515, 115 S.Ct. 1031. Justice Stevens stated in dissent that Alabama's capital-sentencing procedure violates both the Eighth Amendment and the Due Process Clause, but the majority opinion does not mention any due-process claim.
"In Harris, the Supreme Court reasoned that `the hallmark of the analysis is not the particular weight a State chooses to place upon the jury's advice, but whether the scheme adequately channels the sentencer's discretion so as to prevent arbitrary results,' 513 U.S. at 504, 115 S.Ct. 1031, and that the `disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case.' Id. at 515, 115 S.Ct. 1031. Thus, the question is whether Alabama's capital-sentencing *1172 procedure `adequately channels the [trial judge's] discretion so as to prevent arbitrary results.' 513 U.S. at 504, 115 S.Ct. 1031. We conclude that it does.
"The Supreme Court has held that the `danger of an arbitrary and capricious death penalty could be met "by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."` Eddings v. Oklahoma, 455 U.S. 104, 111, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting Gregg v. Georgia, 428 U.S. 153, 195, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Section 13A-5-47, Ala.Code 1975, provides that the trial judge must order and receive a detailed, written, pre-sentence investigation report; must permit the parties to present arguments concerning aggravating and mitigating circumstances and the proper sentence to be imposed; and must enter specific written findings regarding the existence or nonexistence of each and every aggravating circumstance and mitigating circumstance offered by the parties. § 13A-5-47(b)-(d), Ala.Code 1975. Section 13A-5-47(e) further provides that the trial judge must `determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist.' In weighing the aggravating and mitigating circumstances, `the trial court shall consider the recommendation of the jury contained in its advisory verdict.' Id. We conclude that this capital-sentencing procedure ensures that the trial judge is given adequate information and sufficient guidance in deciding whether to accept or to reject a jury's recommended sentence. See Eddings v. Oklahoma, 455 U.S. at 111, 102 S.Ct. 869.
"The Supreme Court held in Harris that the United States Constitution `permits the trial judge, acting alone, to impose a capital sentence' and `is ... not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight.' 513 U.S. at 515, 115 S.Ct. 1031. We find this holding applicable to Taylor's particular Fourteenth Amendment claim."

Trial Court's Sentencing Orders

XXIV.
Our review of the trial court's sentencing orders reflects that the orders are deficient for several different reasons; we must remand this case for the reasons stated below.

A.
First, Stallworth argues that the trial court erred in failing to find as a statutory mitigating circumstance that he had no significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. Specifically, Stallworth argues that his prior conviction for assault in the third degree was not sufficient to negate this mitigating circumstance.
Stallworth did not object to this alleged error; therefore, we are limited to evaluating this issue under the plain-error rule. Rule 45A, Ala.R.App.P.
The presentence report reflects that Stallworth had been convicted of assault in the third degree and had been sentenced to one year's imprisonment and then two years on probation. While he was on probation for this offense he was tried for robbery and acquitted. The trial court in its sentencing orders stated:
"The Court finds that the defendant has a history of prior criminal activity. He has been convicted of one Assault in the Third Degree and was charged with one Robbery in the First Degree, for which he was tried and acquitted. The *1173 Court finds that this is neither an aggravating nor a mitigating circumstance."
(C.R. 12; C.R. 503.)
Initially, we note that only convictions can negate the application of this statutory mitigating circumstance. See Freeman v. State, 651 So.2d 576 (Ala.Crim. App.1994). The sentencing orders imply that the trial court considered Stallworth's arrest and acquittal for a robbery charge when it considered this mitigating circumstance. A charge that does not result in a conviction cannot be used to negate this mitigating circumstance.
Thus, the question becomes, is a conviction for assault in the third degree sufficient to negate this mitigating circumstance? This Court has approved the use of prior misdemeanor convictions to negate the application of § 13A-5-51(1), Ala.Code 1975. See Apicella v. State, 809 So.2d 841, 862 (Ala.Crim.App.2000), on remand, 809 So.2d at 863 (Ala.Crim.App.2000), aff'd, 809 So.2d 865 (Ala.2001) ("This Court has upheld the practice of not applying this mitigating provision when the significant history was based on prior misdemeanor convictions."); Williams v. State, 601 So.2d 1062 (Ala.Crim.App.1991), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992) (prior misdemeanor convictions can negate this circumstance); Richardson v. State, 376 So.2d 205 (Ala. Crim.App.1978), aff'd, 376 So.2d 228 (Ala. 1979) (two misdemeanor convictions for assault sufficient to negate this mitigating circumstance). But see Ex parte Cook, 369 So.2d 1251 (Ala.1978) (prior conviction for malicious destruction of property not sufficient to negate this mitigating circumstance).
However, we have never had occasion to review whether a prior conviction for assault in the third degree can negate this mitigating circumstance. We hold that it can. Unlike the prior misdemeanor conviction in Cookmalicious destruction or propertythe conviction in this case assaultinvolved violence. To be convicted of assault the victim must have suffered from some type of physical injury. See § 13A-6-22, Ala.Code 1975. Assault is a far more "significant" crime than is the malicious destruction of property.
We direct the trial court to indicate in its sentencing order whether it considered Stallworth's arrest for his robbery charge and his subsequent acquittal of that charge when determining whether Stallworth had a significant history of criminal activity. We note that this evidence would be relevant only in determining the "weight" to give this aggravating circumstance. See Ex parte Burgess, 811 So.2d 617 (Ala.Crim.App.2000) (arrest history that is not sufficient to negate § 13A-5-51(1), because there are no convictions; arrest record may be relevant in determining the weight to give the mitigating circumstance).

B.
Stallworth was on probation when he committed the two robbery-murders. In 1996, Stallworth was convicted of assault in the third degree and sentenced to one year's imprisonment, to be followed by two years' probation. Stallworth admitted during his testimony that he was on probation and that he had violated the terms of his probation when he was arrested. (R. 3975.) The trial court failed to find that the aggravating circumstance, § 13A-5-49(1), "The capital offense was committed by a person under sentence of imprisonment" was present in both cases. Section 13A-5-39(7), defines "under sentence of imprisonment":
"As used in Section 13A-5-49(1), the term means while serving a term of imprisonment, while under a suspended *1174 sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence."
This section does encompass those probationers who are on probation for misdemeanor offenses. The gravity of the prior conviction for which the defendant was on probation does not affect the application of this section, only the weight afforded this aggravating circumstance. See Ex parte Burgess, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).
We further direct the trial court to consider this aggravating circumstance when it corrects its sentencing orders and reweighs the aggravating and the mitigating circumstances.

C.
The sentencing orders are also deficient because they fail to state whether the trial court considered the application of any nonstatutory mitigating evidence.
Stallworth argues that he presented nonstatutory mitigating evidence at the penalty phase and that the trial court failed to consider it. He argues that the trial court failed to find as mitigating his childhood experiences, his supportive relationship with his fiancée and child, and the facts that he was helpful in the community, that he was very popular, that he was respectful, and that he was loving person. There is absolutely no indication in the sentencing orders that the trial court considered any nonstatutory mitigating evidence.
As we stated in Ivery v. State, 686 So.2d 495, 503 (Ala.Crim.App.1996):
"`In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in each particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances as found by the trial court. See Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989).'

"Guthrie v. State, 689 So.2d 935, 948 (Ala.Cr.App.1996); ... In this case, the trial court failed to state whether it found any nonstatutory circumstances. Without this finding in the record, we are unable to review the propriety of the sentence of death."
"Ex parte Hart, 612 So.2d 536, 542 (Ala. 1992) (`Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] does not require that all evidence offered as mitigating evidence be found to be mitigating.') ... Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (`"while Lockett, and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority." `)." Ferguson v. State, 814 So.2d 970, 976 (Ala.2001).
The trial court is directed to state in its sentencing order specific findings as to the existence or nonexistence of any nonstatutory mitigating circumstances. "The court need not set out in its sentencing order each and every nonstatutory mitigating circumstance offered by the defendant; it merely needs to set out whether he found any nonstatutory mitigating circumstances, and if so, what those were." Slaton v. State, 680 So.2d 879, 907 (Ala.Crim.App. 1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).

*1175 D.
The trial court's orders are also deficient because they fail to state specific findings of fact as to the evidence it relied on in finding that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. The trial court, in its sentencing orders, stated:
"The Court finds that the capital offense was especially heinous, atrocious, or cruel compared to other capital offense, on constitutional grounds, in that the defendant cut, stabbed and slashed the victim numerous times in causing her death."
(C.R. 11; C.R. 562.) The trial court's orders fail to comply with Ex parte Kyzer, 399 So.2d 330 (Ala.1981), because the trial court failed to make specific findings of fact as to why it believed that this aggravating circumstance was present in each case.
We have approved the application of this aggravating circumstance when the testimony established that the victims were stabbed multiple times and that they had suffered before their deaths. See Price v. State, 725 So.2d 1003 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Barbour v. State, 673 So.2d 461, 471 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Hallford v. State, 548 So.2d 526, 546 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). We quote the trial court's sentencing order in Barbour, where the court stated:
"`The Court does find that Roberts did suffer before she was killed, because she was savagely beaten by Barbour, Mitchell and Hester into a stupefied state or into a state of unconsciousness. In any event, she was rendered helpless. What Roberts's thoughts were during this attack, we will never know. However, common sense dictates that when attacked by three relative strangers, one must be fearful of their ultimate fate. Thus, Roberts sufferedpsychologically. In addition, the blows were surely painful.
"`The Court finds that based on a consideration of all the circumstances from the moment the attack began until Barbour, Mitchell and Hester left Roberts's home, the State has proved beyond a reasonable doubt that the capital offense was heinous, atrocious, or cruel. This legal conclusion is based on an amalgam of the case law on this subject....
"`A summary of the facts is appropriate. Roberts was beaten into a helpless state. She was then raped by Hester as she lay helpless. Barbour concluded that she must die because she knew who her attackers were, and he stabbed her nine times with such force that two of the blows penetrated Roberts' back. Barbour left the murder weapon protruding from Roberts' chest. Barbour then set a fire or fires in an attempt to hide the criminal act. The fires resulted in some mutilation of Roberts's body.'"
673 So.2d at 471 (emphasis in Barbour). The trial court is directed to make specific findings of fact, in both sentencing orders, as to why the murders were "especially, heinous, atrocious, or cruel" as compared to other capital murders.

E.
Stallworth also argues that the trial court erred in allowing the victim's family members to introduce evidence to the effect that they wanted Stallworth to be sentenced to death.
*1176 The record reflects that during the sentencing hearing before the trial court the prosecution presented victim-impact evidence. Danet Cooper, Linda Morton's daughter, read a statement into the record relating how she and her family missed Morton and the impact of her death on their family. She stated the following at the end of her statement, "He deserves the same mercy that he showed my Mom and Mrs. Dukes. That would be none." (R. 4781.) There was also evidence that Nancy Dukes's husband, Jeff Dukes, had given a statement to the probation officer who prepared the presentence report. His statement read, "We must see that this murderer pays for his crimes with his life, the only fair and just punishment." (C.R. 853.)
As we stated in Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000):
"On appeal, Whitehead contends that the testimony of the victim's family to the effect that death was the appropriate sentence for Whitehead was improper under both Alabama and federal law. Whitehead claims that the complained-of testimony was `clearly a factor in the jury's recommendation and the trial court's sentencing decision.' (Whitehead's brief to this court, p. 36.) The State argues that while the admission of this testimony was improper, any error was harmless beyond a reasonable doubt. We agree.
"In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are admissible for the jury's consideration during the sentencing phase of a capital murder trial. `Payne overruled Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which had prohibited the introduction of such evidence at the penalty phase, and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).' McNair v. State, 653 So.2d 320, 331 (Ala.Cr.App. 1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
"`"However, the Payne court did not overrule the rule stated in Booth prohibiting consideration of a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence during the sentencing phase of a capital murder trial. See 501 U.S. at 830, n. 2."'

"Arthur v. State, 711 So.2d 1031, 1093 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Ex parte Rieber, 663 So.2d 999, 1006-07 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). The type of evidence given by the victim's family in this case went beyond that deemed admissible under Payne. Here, Mike Whitten and Edsel Whitten offered their opinions on what they thought the appropriate sentence should be for Whitehead. Such testimony was inadmissible and therefore was improperly presented to the jury for its consideration in sentencing."
777 So.2d at 846-47.
Because this case must be remanded so that the trial court can correct its sentencing order to comply with § 13A-5-47(e), Ala.Code 1975, we also direct the trial court to indicate in its sentencing order whether it considered the victim-impact statements in determining whether Stallworth should be sentenced to death.
By remanding this case so that the trial court can correct its sentencing orders we do not mean to imply that the facts of the two capital murders do not support the *1177 sentences of death imposed by the trial court. We are remanding these cases so that the trial court can comply with Alabama law so that this Court may better review the appropriateness of Stallworth's death sentences.
For the reasons stated above, Stallworth's convictions for the capital murders of Nancy Dukes and Linda Morton are hereby affirmed. This case is remanded for the reasons stated in Part XXIV of this opinion so that the trial court can correct is sentencing order as instructed in Part XXIV. The trial court is further directed to reweigh the aggravating and the mitigating circumstances. Due return should be filed in this Court no later than 60 days from the date of this opinion.
AFFIRMED AS TO CONVICTIONS; REMANDED WITH DIRECTIONS AS TO SENTENCING.
McMILLAN, P.J., and COBB[8] and SHAW, JJ., concur.
BASCHAB, J., recuses herself.

On Return to Remand
WISE, Judge.
The appellant, Calvin Stallworth, was convicted of two counts of capital murder for the murders of Nancy Dukes and Linda Morton. We affirmed Stallworth's convictions but remanded the case for the trial court to correct its sentencing order. See Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001). We specifically instructed the trial court to state whether it had considered a prior charge against Stallworth, for which he had been acquitted, when determining the existence of the statutory mitigating circumstance of no history of prior criminal activity; we instructed the trial court to state specifically what nonstatutory mitigating circumstance it found to exist; we instructed the trial court to specify the facts that supported the application of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel, as compared to other capital offenses; we instructed the trial court to consider an additional aggravating circumstance that the murders were committed while Stallworth was under a sentence of imprisonment; and we instructed the trial court to state whether it had considered the victim-impact statements from the victims' relatives, requesting that the trial court sentence Stallworth to death, in determining that death was the appropriate sentence for Stallworth in each case.
The trial court has complied, in part, with our instructions. However, it is necessary to remand this case because the trial court failed to state whether it had considered the statements of the victims' relatives and it failed to indicate that it had considered the application of the aggravating circumstance that the crimes were committed while Stallworth was under a sentence of imprisonment. (See our in-depth discussion in Part XXIV of our previous opinion explaining the reasons why it was necessary to remand this case for the trial court to correct these deficiencies.)
For the reasons stated above, this case is again remanded to the Circuit Court for Baldwin County for that Court to correct its sentencing order. After correcting its sentencing order, the trial court must again reweigh the aggravating circumstances and the mitigating circumstances. Due return should be filed in this Court no *1178 later than 45 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB and SHAW, JJ., concur.
BASCHAB, J., recuses herself.

On Return to Second Remand
WISE, Judge.
The appellant, Calvin L. Stallworth, was convicted of two counts of capital murder for killing Nancy Dukes and Linda Morton. We affirmed Stallworth's convictions but remanded the case for the trial court to correct several deficiencies in its sentencing order. See Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001). On return to remand we again remanded the case because the trial court failed to correct all of the deficiencies we addressed in our first opinion. See Stallworth v. State, 868 So.2d 1128, 1177 (opinion on return to remand). The trial court has complied with our instructions and has submitted amended sentencing orders.
While this case was pending on return to remand, the United States Supreme Court released Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)two cases that dramatically impacted death-penalty cases throughout the United States.[1] We requested that Stallworth and the attorney general brief the issue of the applicability of Atkins and Ring to Stallworth's convictions and death sentence. We now address those arguments.

Atkins v. Virginia
The United States Supreme Court in Atkins held that the execution of a mentally retarded person violated the Eighth Amendment of the United States Constitution. The court did not define what consisted mental retardation. However, the court stated:
"To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, with regard to insanity, `we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.' 477 U.S. 399, 405, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)."
536 U.S. at 317, 122 S.Ct. at 2250 (footnote omitted).
After its holding in Atkins, the United States Supreme Court remanded Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), to the Alabama Supreme Court because the record indicated that Perkins had an IQ of 76. After remand from the United States Supreme Court, the Alabama Supreme Court released its opinion in Ex parte Perkins, 851 So.2d 453 (Ala.2002). In that opinion, when considering whether Atkins barred *1179 the imposition of the death sentence for Perkins, the court stated:
"We have conducted a thorough review of the record to determine if there is any inference that Perkins is mentally retarded. Although the Legislature has not had an occasion to address this State's policy on this matter and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we conclude that Perkins does not suffer from mental retardation under the definitions considered by the United States Supreme Court in reaching its holding in Atkins or as defined by any of the state statutes that prohibit the imposition of the death sentence on a mentally retarded defendant.
"We agree with the State that this Court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).
"The record establishes that Dr. John Goff, a licensed clinical neuropsychologist and clinical psychologist, testified on Perkins's behalf. According to Dr. Goff, Perkins, when tested as an adult, has a full-score IQ of 76, with a verbal score of 80 and a performance score of 74. Dr. Goff stated that Perkins's IQ scores indicate a borderline range of psychometric intelligence, and that his intellectual functioning has probably declined as he has aged because of his abuse of alcohol. Moreover, the record indicates that Perkins earned a GED certificate while he has been in prison and has completed community college courses there. Dr. Goff diagnosed Perkins with a borderline personality disorder and an alcohol dependence; he did not conclude that Perkins was mentally retarded. We find Dr. Goff's diagnosis pivotal in light of the fact that, when the penalty phase of Perkins's trial was conducted, Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and its progeny were applicable, and evidence of mental retardation established a strong mitigating circumstance to be considered in determining the appropriate sentence.
"Additionally, the evidence presented at trial indicates that Perkins did not exhibit `significant' or `substantial' deficits in adaptive behavior before or after age 18. Perkins was able to have interpersonal relationships. Indeed, he was married for 10 years. He maintained a job as an electrician for a short period. Perkins did not present any evidence during the penalty phase of his trial to establish that he was mentally retarded. The record does not create any inference that Perkins is mentally retarded. Because Perkins cannot establish the common requirements for mental retardation, we reject Perkins's contention that we must remand this cause for resentencing.
"The Virginia Supreme Court in Emmett v. Commonwealth, 264 Va. 364, 569 S.E.2d 39 (2002), confronted a factual situation similar to the one this Court confronts here. The Court affirmed Emmett's sentence of death, noting:
"`The United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d *1180 335 (2002), recently held that the execution of mentally retarded persons violates the Eighth Amendment's prohibition against cruel and unusual punishments. The Court did not establish an express standard for determining when an individual would be considered mentally retarded and left to the States the task of developing appropriate ways to enforce this constitutional restriction upon executions. Atkins, 536 U.S. at 317, 122 S.Ct. at 2250. The General Assembly has not had the opportunity to address this matter following the decision in Atkins.

"`At trial, Emmett did not assert that he is mentally retarded. Moreover, our review of the record reveals nothing that even suggests that he is mentally retarded. Emmett received a high school equivalency diploma, attended a community college, and was regularly employed during his adult life prior to committing the murder in question. Accordingly, we conclude that Emmett does not suffer from any mental retardation that would constitutionally restrict the imposition of the death sentence in this case.'
"264 Va. at 376 n. 2, 569 S.E.2d at 47 n. 2.
"Applying the plain-error standard of review, we hold that because, applying the most common definitions of mental retardation, we find no indication in the record that Perkins is mentally retarded, no reversible error occurred and the imposition of the death sentence in this case is not unconstitutional."
851 So.2d at 455-57 (footnote omitted). We directed the parties to address the effect of Atkins on this appeal because the record disclosed that Stallworth's IQ was 78.
Stallworth argues in his supplemental brief that we should remand this case to the circuit court for resentencing because, he says, the record discloses that he is borderline mentally retarded. He asserts that the fact that the State disputes the evidence indicating that Stallworth is mentally retarded creates a factual question that a jury must resolve. The State counters Stallworth's argument by asserting that there is no evidence in the record to indicate that Stallworth is mentally retarded as that term is generally defined by the majority of states. Currently, 18 states have statutes that prohibit the execution of a mentally retarded defendant. Of those 18 states, 8 statesKentucky, Maryland, Nebraska, New Mexico, North Carolina, South Dakota, Tennessee, and Washingtondefine mental retardation as having an IQ of 70 or below. One stateArkansasdefines mental retardation as having an IQ of 65 or below. Only one state Arizonadefines mental retardation as having an IQ above 70; it uses an IQ of 75.[2]
*1181 The record reflects that before he was tried Stallworth was evaluated by two psychologists Dr. Robert DeFrancisco and Dr. John W. Davis. Dr. DeFrancisco's *1182 report states that he administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and found that Stallworth had a verbal IQ of 78. He also specifically stated that "[Stallworth] is not mentally retarded." (C. 131.) The report states:
"In summary, Mr. Stallworth presented himself as an individual who repeated over and over that he was innocent. He appears to have upper ranges of borderline intelligence. He appears to be alert and oriented. There is no evidence of psychosis. Cognitive structure reveals that he has ability to abstract and reason in a functional capacity though its below normal. He is not mentally retarded."
(C. 131.) Dr. Davis evaluated Stallworth approximately two months after Dr. DeFrancisco had evaluated him. Dr. Davis also administered the Wechsler Adult Intelligence ScaleRevised (WAIS-R), in addition to the Rorshach test, Wide Range Achievement Test-Revised, the Bender test, and the Millon Clinical Multiaxial Inventory II. Dr. Davis found that on the WAIS-R test, Stallworth had a full-scale IQ of 77a verbal IQ of 79 and a performance IQ of 80. He concluded his report by stating:
"[Stallworth] does show an impairment in his intellectual functioning where his intelligence is in the borderline range of mental retardation. He also shows a dependent personality type. The limited intelligence is commonly recognized as an impairment seen in the fact that it qualifies him for special education services in school as well as vocational rehabilitation services, etc."
(C. 979.)
Although Alabama does not have legislation prohibiting the execution of a mentally retarded defendant, Alabama does have the "Retarded Defendant Act." See § 15-24-1 et seq. Ala.Code 1975. This Act addresses the placement of a mentally retarded individual before he/she is tried. Section 15-24-2(3), Ala.Code 1975, defines a mentally retarded person as
"[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments."
This definition is consistent with the majority of those states that have legislation prohibiting the execution of a mentally retarded defendant but that do not establish a specific IQ score as a barrier. See the statutes cited in footnote 2.
We have examined the record, as did the Alabama Supreme Court in Perkins, and find, based on the exhibits, reports, and testimony, that Stallworth fails to meet the definition of mental retardation contained in § 15-24-2 or in specific legislation by any of those states that prohibit the execution of a mentally retarded person. Stallworth's two IQ tests revealed an IQ well above 70an IQ that is above the "significant subaverage" range. See Perkins. Moreover, Stallworth maintained a job for most of his adult life; he has worked as a cook, a brick mason, and a landscaper. Stallworth also has had a long-term relationship and is the father of a daughter who was four months old at the time of the murders. At the time of trial Stallworth was unemployed, but he had qualified for food stamps. There is absolutely no evidence indicating that Stallworth could not function in society or that he had a "significantly subaverage" intellect. Last, as the State argues, there is absolutely no evidence in the record indicating that Stallworth had a history of mental retardation. The only reference in the record to his mental ability is that Stallworth had qualified for special-education *1183 classes because of his borderline intelligence. Stallworth did not make his IQ an issue at trial, nor did he file a pretrial motion pursuant to § 15-24-5, Ala.Code 1975, for release because of his mental condition. It is clear, based on the record before this Court, that Stallworth does not meet the definition of mental retardation as that term is ordinarily defined. Therefore, Atkins poses no impediment to imposing the death sentence on Stallworth.

Ring v. Arizona
The United States Supreme Court in Ring applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S.Ct. at 2432.
Stallworth argues that because the jury was not given the opportunity to return a verdict on any of the aggravating circumstances in his case, he is ineligible, based on the Supreme Court's holding in Ring, for the death penalty. He argues in his brief to this Court:
"One of the aggravating circumstances, that the capital offense was committed during the course of a robbery, § 13A-5-49(4), correlates with the guilt phase verdicts that Mr. Stallworth was guilty of capital murders in the course of robbery. However, the finding of an aggravating circumstance in the first phase does not prevent a jury from declining to find the existence of a penalty phase aggravating circumstance that is based on similar statutory language."
(Stallworth's supplemental brief, pp. 6-7.) Stallworth further argues that the indictment against him is void because, he says, it failed to specify the aggravating circumstances that supported the capital offense.
The State counters by arguing that Stallworth's death sentence complies with Apprendi and Ring because the jury found at the guilt phase that Stallworth had committed both murders during the course of a robbery, and robbery is an aggravating circumstance that will support a death sentence. See § 13A-5-49(4), Ala.Code 1975. It argues: "Thus, the trial court did not raise Stallworth's sentence above the statutory ceiling indicated by the jury's verdict." (State's brief, page 19.)
We have agreed with the State's rationale. See Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ____ (Ala.Crim.App.2002). The holding in Ring was narrow. The Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt. See Apprendi, supra. The Ring Court did not reach the question whether judicial sentencing or judicial override was constitutional. The Ring Court noted in a footnote:
"Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting `the distinction the Court has often recognized between facts in *1184 aggravation of punishment and facts in mitigation,' (citation omitted [in Ring ])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) (`[I]t has never [been] suggested that jury sentencing is constitutionally required.'). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S., at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Fourteenth Amendment `has not ... been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury"')."
536 U.S. at 596 n. 4, 122 S.Ct. at 2437 n. 4.
Here, the jury's verdict in the guilt phase found Stallworth guilty of two counts of robbery/murder. Robbery is an aggravating circumstance. See § 13A-5-49(4), Ala.Code 1975. This verdict made Stallworth eligible for the death penalty. As § 13A-5-45(e) provides:
"At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
See Turner v. State, supra.
Moreover, one of the aggravating circumstances in this case related to a prior convictionthat the capital offense was committed by a person under sentence of imprisonment. See § 13A-5-49(1), Ala. Code 1975. The Apprendi Court specifically excluded from its holding prior convictions. The Apprendi Court stated, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The Court left untouched its holding in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), that an increase in a sentence related to recidivism is left to the trial court. As the Maryland Court of Appeals recognized after Apprendi:
"The rule that prior convictions do not have to be proven to a jury beyond a reasonable doubt was first recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). There, the Supreme Court emphasized that questions related to recidivism have traditionally been decided by the sentencing court rather than the jury. Justice Breyer, delivering the opinion of the Court, wrote:
"`First, the sentencing factor at issue hererecidivismis a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. Consistent with this tradition, the Court said long ago that a State need not allege a defendant's prior conviction in the indictment or information which alleges the elements of an underlying crime, even though the conviction was necessary to bring the case within the statute. That conclusion follow[s] ... from the distinct nature of the issue, and the *1185 fact that recidivism does not relate to the commission of the offense, but goes to the punishment only, and therefore ... may be subsequently decided.'
"Id. at 243, 118 S.Ct. at 1230-31, 140 L.Ed.2d 350 (emphasis in original) (internal quotation marks and citations omitted [in Stewart]).
"In Apprendi, the Court emphasized that it was not overruling Almendarez-Torres. Apprendi, 530 U.S. at 489, 120 S.Ct. at 2362, 147 L.Ed.2d 435. In fact, the Court reiterated that recidivism is a traditional grounds for a sentencing court's increasing an offender's sentence, and that recidivism does not relate to the commission of the offense. Id. at 488, 120 S.Ct. at 2361-62, 147 L.Ed.2d 435 (quoting Jones v. United States, 526 U.S. 227, 248-49, 119 S.Ct. 1215, 1227, 143 L.Ed.2d 311 (1999)).
"....
"In United States v. Santiago, 268 F.3d 151 (2nd Cir.2001), the trial judge sentenced the defendant pursuant to a statute that required that the defendant have three prior convictions arising from offenses committed on different occasions. The defendant argued that the `prior conviction' exception does not encompass the question whether prior convictions arose from offenses committed on different occasions. The United States Court of Appeals for the Second Circuit rejected the defendant's argument, reasoning as follows:
"`In short, we read Apprendi as leaving to the judge, consistent with due process, the task of finding not only the mere fact of previous convictions but other related issues as well. Judges frequently must make factual determinations for sentencing, so it is hardly anomalous to require that they also determine the "who, what, when, and where" of a prior conviction.'

"Id. at 156.

"Santiago reflects the general rule that the Almendarez-Torres exception covers questions related to recidivism, not merely the fact of prior conviction. Appellee's previous term of incarceration, like prior convictions arising from crimes committed on separate occasions, Santiago, 268 F.3d at 156, or the aggravated nature of a prior conviction, [U.S. v.] Becerra-Garcia, 28 Fed.Appx. 381, at 385, 2002 U.S.App. LEXIS 311, at *11 [(6th Cir.2002)], is a fact related to recidivism, and, as stated above, recidivism is a question that traditionally has been reserved for the sentencing court."
State v. Stewart, 368 Md. 26, 39-41, 791 A.2d 143, 151-52 (2002). We agree with the rationale and holding of the Stewart court. Whether at the time of the murders Stallworth was under a sentence of imprisonment because he was on probation for his prior conviction for assault in the third degree was a question related to Stallworth's prior convictiona question for the trial court to resolve. Therefore, this aggravating circumstance was not subject to the holdings in Apprendi and Ring.
Last, the trial court also found that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8). The State argues that because by its verdict in the guilt phase a jury had already found the existence of one aggravating circumstancethat the murders were committed during the course of a robberyany other aggravating circumstances the court found could not increase his sentence. We have agreed with this rationale. See Turner v. State, supra. Stallworth was eligible for the death penalty based on the jury's finding in the guilt phase of the existence of the aggravating circumstance that the *1186 murders were committed during a robbery. The trial court's application of other aggravating circumstances did not violate Apprendi and Ring.
Stallworth also argues, in relation to the Ring issue, that his indictment was void because it failed to include in the indictment the aggravating circumstances the State intended to prove. In Poole v. State, 846 So.2d 370 (Ala.Crim.App.2001), we held that, although Apprendi required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts did not have to be alleged in the indictment. Recently, the Alabama Supreme Court adopted our holding in Poole. See Hale v. State, 848 So.2d 224 (Ala.2002).
Also, the holdings in Poole and Hale are consistent with prior caselaw, which holds that aggravating circumstances do not have to be alleged in the indictment. See Ex parte Lewis, 811 So.2d 485 (Ala.2001), and Dobard v. State, 435 So.2d 1338 (Ala. Crim.App.1982). Stallworth's argument is not supported by Alabama law.[3]
As required by § 13A-5-53, Ala.Code 1975, we will now address the propriety of Stallworth's convictions and sentences to death.

Linda Morton's murder (CC-98-112)
Stallworth was indicted and convicted of murdering Linda Morton during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Stallworth be sentenced to death.
The record reflects that Stallworth's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
The trial court found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Stallworth be sentenced to death. The trial court found three aggravating circumstancesthat the murder was committed during the course of a robbery (§ 13A-5-49(4)); that the murder was committed while Stallworth was under a sentence of imprisonment (§ 13A-5-49(1)); and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders (§ 13A-5-49(8)). The trial court found no statutory or nonstatutory mitigating circumstances.
In regard to the application of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel we earlier remanded the case so that the trial court could make specific findings of fact. The trial court made the following findings on remand:
"In addition to the above, the Court further finds that the victim suffered before her death. The forensic pathologist testified that the victim had a stab wound 3½ [inches] deep that severed her spinal cord, a stab wound 5 to 6 [inches] deep into her head and two defensive stab wounds. She had 6 stab wounds altogether. The victim had apparently tried to ward off the knife blows and had received the defensive knife wounds before she received the fatal blows. She must have known and been fearful of her ultimate fate as the knife wounds were inflicted. The defendant knew that he must kill the witness to this crime."
In Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.2000), we stated the following *1187 concerning the application of this aggravating circumstance:
"In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' The appellant's assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or brutality upon the victim, or that he took pleasure in having committed the murder. It is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted. See Norris v. State, [793] So.2d [847] (Ala.Cr.App.1999)."
788 So.2d at 907-08.
The testimony showed that Linda Morton was stabbed six times. The coroner testified that of the six stab wounds any of four of the wounds would have been sufficient to cause death. Two of the wounds were superficial and were described as defense-type wounds. The coroner also described Morton's wounds as painful. There was evidence indicating that Morton tried to ward off her attacker as he repeatedly stabbed her in the chest and back. Certainly in the time that she was attempting to fend off the attack Morton was in fear that her death was imminent. Morton's death was especially heinous, atrocious or cruel as defined by Alabama law. Deaths by multiple stab wounds have been found to meet the definition of especially heinous, atrocious or cruel. See Ex parte McNair, 653 So.2d 353 (Ala.1994); Ex parte Davis, 554 So.2d 1111 (Ala.1989); Price v. State, 725 So.2d 1003 (Ala.Crim. App.1997).
As required by § 13A-5-53(b)(2), we have weighed the aggravating and the mitigating circumstances in Morton's murder. We agree with the trial court's findings that death is the appropriate sentence in this case.

Nancy Dukes's murder (CC-98-113)
Stallworth was also indicted and convicted of murdering Nancy Dukes during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Stallworth be sentenced to death.
The record reflects that Stallworth's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found three aggravating circumstancesthat the murder was committed during the course of a robbery (§ 13A-5-49(4)); that the murder was committed while Stallworth was on probation (§ 13A-5-42(1)); and that the murder was especially, heinous, atrocious, or cruel as compared to other capital murders (§ 13A-5-49(8)). The trial court found no statutory or nonstatutory mitigating circumstances.
Concerning the aggravating circumstance that the murder was especially heinous, *1188 atrocious, or cruel, the trial court stated:
"In addition to the above the Court further finds that the victim suffered before her death. A witness who arrived on the crime scene said that the victim was on her knees, trying to get up and she was shaking, alive and gurgling. An autopsy revealed that she had been stabbed, cut or slashed 41 times. She must have known and been fearful of her ultimate fate as the knife wounds were inflicted. The defendant knew that he must kill the witness to his crime."
Stallworth does not challenge the trial court's finding that Nancy Dukes's murder was especially heinous, atrocious, or cruel as compared to other capital murders. Indeed, we have often stated that murders by multiple stab wounds where there is evidence that the victim suffered before death are sufficient to meet the statutory definition of this aggravating circumstance. (See the following cases where we affirmed the trial court's finding that the murders were especially heinous, atrocious, or cruel as compared to other capital murders: Price v. State, 725 So.2d 1003 (Ala.Crim. App.1997), aff'd, 725 So.2d 1063 (Ala.1998) (victim suffered 39 stab wounds and lived though the initial attack and watched as the perpetrators attacked his wife); Barbour v. State, 673 So.2d 461 (Ala.Crim.App. 1994), aff'd, 673 So.2d 473 (Ala.1995)(victim was beaten until she was helpless, raped, stabbed nine times, and set on fire); Dunkins v. State, 437 So.2d 1349 (Ala.Crim. App.1983), aff'd, 437 So.2d 1356 (Ala.1983) (victim was stabbed 66 times, raped, and tied to a tree); Brown v. State, 545 So.2d 106 (Ala.Crim.App.1988), aff'd, 545 So.2d 122 (Ala.1989) (victim was stabbed 78 times and beaten with iron skillet and ultimately was killed when his throat was cut).)
As required by § 13A-5-53(b)(2), we have weighed the aggravating circumstances and the mitigating circumstances in the Dukes's murder. We agree with the trial court's findings that death was the appropriate sentence in that case because the murder was committed during a robbery, Stallworth was on probation at the time of the murder, and the murder was especially heinous, atrocious, or cruel, and there were no mitigating circumstances.
Section 13-5-53(b)(3) provides that we must address whether Stallworth's sentences to death are disproportionate or excessive to penalties imposed in similar capital murders. Stallworth's sentences are neither. "`In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.'" Smith v. State, 795 So.2d 788, 842 (Ala.Crim.App. 2000), quoting McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999).
Last, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Stallworth's substantial rights and have found none.
Stallworth's sentences to death for the murders of Nancy Dukes and Linda Morton are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB and SHAW, JJ., concur.
BASCHAB, J., recuses herself.
NOTES
[1] This case was originally assigned to another member of this Court. It was reassigned to Judge Wise on January 16, 2001. Although Judge Wise was not a member of this Court when this case was orally argued, she has reviewed the audiotapes and videotapes of the oral argument.
[2] Pickens is referred to in the transcript both as Stallworth's wife and as Stallworth's fiancée.
[3] The year before the two murders Stallworth had been convicted of assault in the third degree. At the time of the murders he was on probation for this offense.
[4] The Supreme Court also reversed Graves's pistol-possession conviction.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] This represents Stallworth's entire argument on this issue.
[7] Burglary in the first degree requires that the unlawful entry be of a dwelling. See § 13A-7-5, Ala.Code 1975.
[8] Although Judge Cobb was not present at oral argument, she has listened to the audiotapes of that oral argument.
[1] Because we are obliged to search the record for any plain error and because Stallworth's case was not final when Atkins and Ring were released, we have applied those holdings to this appeal. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
[2] The states that prohibit the execution of a mentally retarded defendant have specific legislation defining mental retardation. Those states differ only in their definition. Those 18 states define mental retardation as follows: "If the prescreening psychological expert determines that the defendant's intelligence quotient is higher than seventy-five, the notice of intent to seek the death penalty shall not be dismissed on the ground that the defendant has mental retardation." Ariz.Rev.Stat. § 13-703.02.C. (Supp.2002) (emphasis added); "There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below." Ark.Code Ann. § 5-4-618(2) (Michie 1997) (emphasis added); "`Mentally retarded defendant' means any defendant with significantly subaverage general intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested and documented during the developmental period." Colo. Rev.Stat. § 18-1.3-1101(2) (2002); "[M]ental retardation means a significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." Conn. Gen.Stat. § 1-1g(a) (2001); "[T]he term `mental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Fla. Stat. Ann. § 921.137(1) (Supp.2003); "`Mentally retarded' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." Ga.Code Ann. § 17-7-131(a)(3) (1997); "`[M]entally retarded individual' means an individual who, before becoming twenty-two (22) years of age, manifests: (1) Significantly subaverage intellectual functioning; and (2) Substantial impairment of adaptive behavior; that is documented in a court ordered evaluative report." Ind.Code § 35-36-9-2 (1998); "`[M]entally retarded' means having significantly subaverage general intellectual functioning, as defined by K.S.A. 76-12b01 and amendments thereto, to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." Kan. Stat. Ann. § 21-4623(e) (1995); "`Significantly subaverage general intellectual functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below." Ky.Rev.Stat. Ann. § 532.130(2) (Michie 1999) (emphasis added); "[T]he defendant ha[s] significantly below average intellectual functioning, as shown by an intelligence quotient of 70 or below on an individually administered intelligence quotient test and an impairment in adaptive behavior." Md. Ann.Code, Ann. Criminal Law § 2-202 (2002) (emphasis added); "`[M]ental retardation' or `mentally retarded' refer to a condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age." Mo.Rev.Stat. § 565.030(6) (Supp.2001); "[M]ental retardation means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior. An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation." Neb.Rev.Stat. § 28-105.01(3) (2002) (emphasis added); "An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation." N.M. Stat. Ann. § 31-20A 2.1(A) (Michie 2000) (emphasis added); "`[M]ental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior which were manifested before the age of eighteen." N.Y.Crim. Proc. Law § 400.27(12)(e) (McKinney Supp.2002); "Significantly subaverage general intellectual functioning.An intelligence quotient of 70 or below." N.C. Gen.Stat. § 15A-2005(a)(1)c. (2001) (emphasis added); "An intelligence quotient exceeding seventy on a reliable standardized measure of intelligence is presumptive evidence that the defendant does not have significant subaverage general intellectual functioning." S.D. Codified Laws § 23A-27A-26.2 (Michie Supp.2002); "Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." Tenn.Code Ann. § 39-13-203(a)(1) (1997) (emphasis added); "`Significantly subaverage general intellectual functioning' means intelligence quotient seventy or below." Wash. Rev.Code § 10.95.030(2)(c) (2002) (emphasis added).

The Oklahoma Court of Criminal Appeals, in response to the legislature's and governor's failure to agree on legislation addressing the Atkins decision, adopted a definition of mental retardation. See Murphy v. State, 54 P.3d 556 (Okla.Crim.App.2002). The Court stated, in part, "[N]o person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test." 54 P.3d at 568 (footnote omitted).
[3] We note that Stallworth was convicted of two counts of murder during the course of a robbery. The aggravating circumstance of robbery was included in Stallworth's indictment.